VALLEY COUNTY, Appellant, *v.* THOMAS, County Treas-
urer, et al., Respondents.

(No. 7,922.)

(Submitted June 23, 1939. Decided December 4, 1939.)

[97 Pac. (2d) 345.]

348

*Messrs. Booth & Booth* and *Mr. Thomas R. Marron,* County Attorney of Valley County, for Appellant, submitted an original and a supplemental brief, and argued the cause orally.

*Mr. Homer A. Hoover,* County Attorney of McCone County, *Mr. John M. Kline,* and *Mr. C. H. Roberts,* for Respondents, submitted an original and a reply brief; *Mr. Kline* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

By this action Valley county seeks to enjoin McCone county and the treasurer thereof from issuing automobile licenses upon cars owned and taxable within Valley county, and to cancel such licenses already issued, or to recover from McCone county the sums Valley county would have received if the licenses had been issued by it. Judgment was for defendants and plaintiff has appealed.

The first cause of action, which is for injunction, alleges that Valley county was created by legislative enactment in 1893; that its boundaries are defined by section 4355, Revised Codes, and have never been changed; that under section 1759, Id., as amended by Chapter 72 of the 1937 Session Laws, owners of motor vehicles operated upon the public highways of Montana are required to apply for and obtain licenses from the treasurer of the county wherein such motor vehicles are owned or taxable, and that before such license is issued the personal property taxes thereon for the current year, as well as the license fee thereon, must be paid; that the defendants county treasurer and county "have accepted applications and issued licenses upon cars owned and taxable within Valley county, Montana, and unless restrained and enjoined will continue" so to do contrary to law; that defendants' action involves a loss to plaintiff and irreparable damage, and that plaintiff has no other plain, speedy and adequate remedy.

The second cause of action contains the additional allegations that such licenses have been issued by defendants in numbers and to parties unknown to plaintiff; that in order to determine the status of the licenses and moneys derived therefrom the defendants should "render a true account of the licenses applied for and issued upon motor vehicles owned and taxable in Valley county;" that such licenses should be cancelled so that the owners will apply for proper licenses, but that if the same cannot be cancelled, Valley county should recover from McCone county such amounts as it would have received if the licenses had been issued by it. During the trial it was agreed by the parties that the recovery right would in any event extend only to license fees, as plaintiff would not itself have collected property taxes upon the automobiles in question.

Defendants' answer to both causes of action denied that they accepted any application for or issued any license upon any motor vehicle "owned or taxable within Valley county, Montana," or intended to do so, but admitted that they had issued automobile licenses for persons residing in Fort Peck townsite. They proceeded to describe the land upon which Fort Peck townsite is situated; alleged that it and other lands purchased by the United States before January 17, 1934, in connection with the Fort Peck Dam project are not part of Valley county; that the legislature in 1937 had no jurisdiction over the same and that Chapter 72 of the 1937 Session Laws is, therefore, inapplicable thereto; that "the road from the Fort Peck townsite to McCone county * * * is upon land purchased by the United States, in connection with the Fort Peck Dam project prior to January 17, 1934"; that "motor vehicles within or owned by persons residing on the Fort Peck townsite go by this road * * * into McCone county, without going into Valley county;" that "such motor vehicles, or most of them, are running daily in this way between the townsite and the works of the United States in McCone county;" that "in every instance where an application was received or a license issued by McCone county to anyone residing on the townsite of Fort Peck, the vehicle was either on the townsite or within McCone county

on January 1, 1938, and was within McCone county at the time of the application for and the issuance of the license, and was in daily or almost daily use on the works of the United States in McCone county, and the owner had his home on the townsite; in a number of instances the legal residence of the owner was in McCone county. In instances where the motor vehicles were working on the works of the United States in McCone county (and there are a number of such instances) the vehicle was in McCone county anyway for approximately eight hours of every day it worked.''

Those allegations seem to assume that within the intent of the statute in question an automobile is ordinarily ''owned or taxable'' at the domicile of the owner, unless controlled in certain instances by the fact that the owner had his voting residence elsewhere, or that he habitually employed the automobile on work elsewhere or had it with him on such work, or by the fact that the automobile was in another county on January 1, or at the time of the application for and issuance of the license. We shall consider these matters later in this opinion. But for present purposes, these and other allegations of the answer and of respondents' briefs may fairly be taken as an admission that some, at least, of the automobiles licensed in McCone county were ''owned or taxable'' in Fort Peck townsite within the meaning of the statute, if applicable.

It is unnecessary to detail the answer further, except to state that it sufficiently tendered the issues whether automobiles ''owned or taxable'' within Fort Peck townsite were ''owned or taxable'' within Valley county, and whether the taxing power of the state of Montana extends to Fort Peck townsite so that the state has jurisdiction to collect property taxes or license fees upon automobiles therein ''owned or taxable.''

The plaintiff's evidence showed that about January 3, 1938, the county officials of Valley county learned that the county treasurer of McCone county had opened a branch office across the river from Fort Peck and was issuing licenses upon the cars of Fort Peck residents; that at that time and prior to the decision handed down by this court in the second *Bruce Case*, infra,

on March 14, 1938, the Valley county officers were insisting upon the payment of taxes as prerequisite to the issuance of a license, but that after that decision they required only the license fee as to cars owned in Fort Peck townsite. No direct testimony was offered as to any particular cars owned or taxable in Fort Peck townsite, or Valley county, upon which licenses had been so issued by the treasurer of McCone county. Copies of a number of application cards, certified by the Registrar of Motor Vehicles, were admitted in evidence purporting to show that the said cars mentioned therein were owned in Fort Peck townsite. These cars bore the notation "Tax exempt by reason of military reservation." Defendants offered no evidence.

We will pass for the present the question whether Valley county is entitled to recover from McCone county the license taxes received from the cars in question, and will proceed to a discussion of the issues involved in the cause of action for injunction, which are almost entirely issues of law.

It was stipulated at the trial: "That Fort Peck is situated on the land described in the amended answer in this cause and that that is the land of which the Supreme Court of this state decided that the United States has exclusive jurisdiction in the case of *State ex rel. Board* v. *Bruce*, [106 Mont. 322], 77 Pac. (2d) 403, and also in *State ex rel. Board* v. *Bruce* [104 Mont. 500], 69 Pac. (2d) 97;" and "while no part of the land considered in those two cases is in McCone county that the government works do extend over and into McCone county."

The learned trial judge made and entered as preliminary to entry of judgment the following opinion:

"The above entitled case having been regularly submitted upon oral and documentary evidence and upon briefs filed by the attorneys for the respective parties,

"And it appearing to the Court that the effect of the decisions of the Supreme Court of the State of Montana in the case of *State ex rel. Board* v. *Bruce*, 104 Mont. 500, 69 Pac. (2d) 97, and *State* v. *Bruce* [106 Mont. 322], 77 Pac. (2d) 403, is to hold that the Fort Peck townsite and military reservation

has been entirely removed from the jurisdiction of the State of Montana for all purposes except certain reservations regarding the service of process, etc., which decisions are binding upon this Court.

"And it appearing that the effect of such decisions is to exempt all automobiles owned within such reservation from the operation of the automobile license tax of the State of Montana so long as said automobiles are operated only on said reservation, and that such automobiles are subject to the license tax only when they presume to operate outside of said limits, which would, in effect, make them subject to license in practically the same manner as cars owned in a foreign state.

"And it, therefore, appearing that there is nothing, either in the law or the evidence, which would indicate that said cars must of necessity be licensed within the county of Valley,—

"Now, therefore, it is the opinion of this Court that the plaintiff's complaint herein should be dismissed and the temporary restraining order heretofore issued by this Court should be dissolved.

"Judgment may be prepared and entered accordingly."

It is thus apparent that the trial court based its decision entirely upon this court's decisions as to jurisdiction in the *Bruce Cases*, as it was necessarily required to do, and that it therefore had no occasion to consider the evidence offered under the second cause of action as to Valley county's claim against McCone county for a money recovery.

In certain situations this court, like the trial court, might feel precluded by the rule of *stare decisis* from re-examining the issues determined by the two Bruce decisions. However, the ordinary reasons for the rule of *stare decisis* do not here apply, since the chief question involved is that of future official action. Furthermore, the issues involved relate to the basic questions of state sovereignty and the cession of sovereign jurisdiction, which are too important to be deemed concluded by decisions which seem to us questionable. We therefore feel it necessary as well as desirable to re-examine those questions.

Respondents' contentions are that under the decisions in the two *Bruce Cases,* supra, the state has ceded to the federal government exclusive jurisdiction over the territory in question, that it is no longer a part of Valley county or of the state, at least so far as the taxing and licensing statutes are concerned, and that automobiles there situated are not "owned or taxable" within Valley county. Their case is grounded on the further premise that such automobiles must be licensed before they can use the highways of the state, but that the owners may purchase the licenses wherever they choose, or at least that Valley county has no monopoly upon such sales and no right to enjoin McCone county from issuing such licenses.

This is not a controversy between the state and federal governments over jurisdiction; the federal government has made no effort to tax property situated on the project. In essence it is a conflict between the state and certain of its residents or citizens, who assert an immunity from state taxation as to their property whose situs is on the project.

The constitutional and statutory provisions to be considered in this case are Article I, section 8, clause 17 of the federal Constitution, and sections 24, 25 and 25.1 Revised Codes of Montana. They are as follows:

Article I, section 8, clause 17: "The Congress shall have power * * * To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of government of the United States; and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings" etc.

Section 24, Revised Codes: "The legislative assembly consents to the purchase or condemnation by the United States of any tract of land within this state for the purpose of erecting forts, magazines, arsenals, court-houses, postoffices, and other needful buildings, upon the express condition that all civil process issued from the courts of this state, and such criminal process as

may issue under the authority of this state, against any person charged with crime, may be served and executed thereon in the same mode and manner, and by the same officers, as if the purchase or condemnation had not been made.''

Section 25, Revised Codes: ''Pursuant to Article I, section 8, paragraph 17, of the Constitution of the United States, consent to purchase is hereby given, and exclusive jurisdiction ceded, to the United States over and with respect to any lands within the limits of this state, which shall be acquired by the United States, for any of the purposes described in said paragraph of the Constitution of the United States, said jurisdiction, to continue as long as the said lands are held and occupied by the United States for public purposes; reserving, however, to this state a concurrent jurisdiction for the execution upon said lands of all process, civil or criminal, lawfully issued by the courts of the state, and not incompatible with the cession hereby made; provided, that an accurate map or plat and description by metes and bounds of said land shall be filed in the office of the county clerk and recorder of the county in which the same are situated, and if such lands shall be within the corporate limits° of any city, such map or plat shall also be filed in the office of the city clerk of said city; and provided, further, that the state reserves the right to tax all property of any railroad or other corporation having a right of way or location over or upon the said land.''

Section 25.1, Revised Codes: ''That consent to purchase or condemn all necessary lands is hereby given and concurrent jurisdiction shall be, and the same is hereby, ceded to the United States over the Fort Peck dam, the body of water or artificial lake created by such dam, the land under such body of water, and any lands now owned or which may be hereafter acquired by the United States and which shall touch such body of water, all such being situated in the counties of Valley, Phillips, McCone, Garfield, Petroleum and Fergus, State of Montana, saving, however, to the said state the right to serve civil or criminal process within the limits of the territory over which jurisdiction is so ceded in any suits or prosecutions for or on account

of rights obtained, obligations incurred, or crimes committed in said state, within or without said territory, and saving further to the said state the right to tax persons and corporations, their franchises and property within said territory, and reserving further to the said state and its inhabitants, citizens, and non-residents the right to fish or hunt by boat or otherwise, and the right of access, ingress and egress to and through said. ceded territory to all persons owning or controlling livestock for the purpose of watering the same, and saving further to the state jurisdiction in the enforcement of the state laws relating to the duties of the livestock sanitary board, and the state board of health, and the enforcement of regulations promulgated by said boards in accordance with the laws of said state; provided, however, that jurisdiction shall not vest until the United States, through the proper officers, notifies the governor of the state of Montana that they assume police or military jurisdiction over said territory.''

As stated in the Bruce decisions, the question is whether jurisdiction passed to the federal government under section 24 as deemed amended by section 25, or under section 25.1. It will be noted that section 25 confers ''exclusive jurisdiction,'' with a reservation to the state of certain ''concurrent jurisdiction,'' whereas section 25.1 confers only ''concurrent jurisdiction.'' For that reason it is well to consider briefly the history of this dual jurisdiction of state and national government.

Originally, of course, each of the thirteen states had exclusive sovereign jurisdiction within its boundaries. Upon the adoption of the United States Constitution each state thereby gave up a portion of its exclusive jurisdiction to the new supergovernment, thus establishing the principle of concurrent jurisdiction. Since the seat of the new government and its essential army and navy establishments must necessarily occupy some part of the territory of one or more of the states, it seemed necessary in order to assure its independence from state control within its legitimate constitutional jurisdiction, and the police power essential to such independence, that as to such territory the concurrent jurisdiction of the states be entirely eliminated

and the exclusive jurisdiction handed over to Congress. The immediate cause of the insertion of that clause seems to have been the appearance of a mob of mutineers from the Continental Army at the assembly place of the Congress. On the other hand, since it was considered that the powers of the federal government were strictly limited by the Constitution, so that there was no danger of interference with state functions by the federal government, and because the national laws and jurisdiction should have uniform application throughout the nation, no such exclusive jurisdiction was given to the state over any part of its territory. It was early established that the federal government had exclusive jurisdiction over the public domain outside of the states, subject to territorial establishments set up by Congress. On the admission of new states the matter of concurrent and exclusive jurisdiction was provided for by appropriate provisions in Enabling Acts and state Constitutions, and thereafter by subsequent legislative enactments by the states.

Thus the only exclusive jurisdiction is that of the federal government, and, strictly speaking, it would seem that whenever the state reserves any power at all, even that of serving civil or criminal process, the jurisdiction is concurrent and not exclusive. However, the terminology used has not been exact. It was held in *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. 995, 1000, 29 L. Ed. 264, that the reservation of power to serve process in a ceded territory does not constitute ''any reservation of concurrent jurisdiction or legislation.'' On the other hand, in *Atkinson* v. *State Tax Commission of Oregon,* 303 U. S. 20, 58 Sup. Ct. 419, 421, 82 L. Ed. 621, the court spoke of '' 'exclusive jurisdiction' with the *sole reservation* of the right to serve process,'' thus indicating that it was a reservation of some jurisdiction, i. e., of the state legislation relative to service of process. Furthermore, it is well settled that the state in ceding jurisdiction, even for the purposes mentioned in the constitutional provision above quoted, may make such reservations of jurisdiction and such conditions as it sees fit (*James* v. *Dravo Contracting Co.,* 302 U. S. 134, 58 Sup. Ct. 208, 82 L. Ed. 155, 114 A. L. R. 318),

and that the federal government can accept the jurisdiction subject to such reservations and conditions as are not inconsistent with the proposed governmental use (*Mason Co. v. Tax Commission of Washington*, 302 U. S. 186, 58 Sup. Ct. 233, 82 L. Ed. 187), inconsistent reservations or conditions probably making the state's consent utterly void. (*Fort Leavenworth R. R. Co. v. Lowe*, supra.)

While, therefore, prior to the enactment of section 25.1 the ██ federal government already had some "concurrent jurisdiction" over all land in the state of Montana, it is worthy of note that that term rather than "exclusive jurisdiction" was used in the Act. It is very clear that the jurisdiction intended by the legislature to be ceded over the Fort Peck project was to be strictly limited. Whether the specific limitations included in the Act constitute the only jurisdiction reserved, or whether the state intended by the cession of only "concurrent jurisdiction" to retain concurrent jurisdiction in all other respects not essential to the federal purposes, is not now before us.

These Acts will be discussed at length later in this opinion, but it is well to note at this point that sections 24 and 25 constitute the general ceding statute, and that section 25.1, which became effective on January 17, 1934, constitutes a special ceding Act applicable to the Fort Peck project only. Therefore, if the general statute, sections 24 and 25, was ever applicable to projects of the type in question, it was superseded entirely as to the Fort Peck project on January 17, 1934, except as to territory, if any, to which the jurisdiction had already passed.

Before proceeding to determine whether the jurisdiction over the territory involved in the Fort Peck project passed under sections 24 and 25, or under section 25.1, we must first, therefore, note the facts as to the lands and the steps in the acquisition thereof by the federal government, and its assumption of the ceded jurisdiction over them. These facts are not shown by the evidence in this case; however, they constitute public and private official acts of the executive department of the

358

United States and of the state of Montana, and are therefore before us under section 10532, subdivision 3, Revised Codes.

The project was the impounding of water of the Missouri River by the construction of the Fort Peck Dam, for navigation and flood control purposes. The lands to be flooded are situated in Valley, Phillips, McCone, Garfield, Petroleum and Fergus counties. The river is the dividing line between Valley and McCone counties at the dam. For convenience the construction headquarters were placed at Fort Peck townsite, on the Valley county side, on lands purchased from Chester T. Taylor, Peter Maxness, and the state of Montana, ninety-four per cent. thereof being on the Taylor land. The townsite was almost entirely for temporary purposes, as few employees will be required after the completion of the dam.

On November 11, 1933, the United States obtained from Taylor an option to purchase his land for $23,500. It provided: "This option to be exercised by giving me notice of acceptance within thirty days, * * * possession to be given immediately upon notice of acceptance." On December 26, 1933, authority to purchase and take possession of these lands was requested of the Secretary of War, which was first granted on December 28, 1933. On December 1, 1933, and thereafter, without waiting for such authority, certain employees of the United States had entered upon the land with Taylor's consent, and continued in possession of them thereafter. During December, 1933, prior to the granting of authority, preliminary arrangements and improvements were made on the lands by the United States. Later, on February 10, 1934, twenty-four days after the enactment of section 25.1, a contract for the purchase and sale of the same lands, for the same price, was executed by the United States and Taylor. The deeds for the lands were not executed until April 11, 1934, June 16, 1934, and January 5, 1935. The title to an 80-acre tract of the Taylor lands was based on a tax title, which the Department of Justice failed to approve. A friendly condemnation suit was brought as to this tract, the award being the contract price, and the decree was recorded November 2, 1935. The Maxness land was ac-

quired by the United States in a similar manner, except that no condemnation proceeding was involved. In both instances the dates of option, going into possession, commencing of preliminary improvements, consent to purchase, subsequent agreement to buy and sell, and consummation of the purchase and sale were substantially the same. All agreements by the United States to purchase the land, and all conveyances of title to the United States were made after the effective date of section 25.1.

The facts relating to the government's entry upon and acquisition of state lands were as follows, as disclosed by the minutes and records of the State Land Office. The negotiations were initiated on July 13, 1933, by a telegram to the Attorney General from the United States Engineer Office at Kansas City, Missouri, stating: ''This office contemplates core drilling and test pit work for a proposed dam site near Glasgow, Montana. A portion of the land on which these operations are to be conducted is understood to be owned by the State of Montana, a description of which follows: * * * Please telegraph this office * * * whether your department is in a position to grant this office authority to go upon the above described property and conduct these operations. If so please forward as soon as possible such document setting forth this authority in full, prepared in the name of the United States of America represented by Theodore Wyman, Jr., Captain, Corps of Engineers, United States Army. * * * Should you not be in a position to grant the authority requested please acknowledge receipt by telegraph and furnish the name and address of the proper officer to which application should be made therefor. * * * '' A meeting of the State Board of Land Commissioners was held on the same date, at which a resolution was adopted granting the desired authority.

The next communication was a letter from the United States Engineer Office of the War Department at Glasgow, Montana, dated November 7, 1933, stating:

''It will be necessary for the United States to secure title to all of Sec. 16, Twp. 26, N. R. 41 East, which land according to the records still is State or school land. Since this land is

in the immediate vicinity of the dam site we desire to consummate the purchase of this land as soon as possible and to secure immediate possession of the same.

"Will you kindly inform the writer of the procedure to follow in the purchasing of State land. Will it be sold at public or private sale and will any publication of the sale be required?

"Should this land be leased or sold under Contract will you kindly inform me so that the necessary steps may be taken to clear the title to the land.

"We will undoubtedly be coming across other land from time to time, which is owned by the State and that it will be necessary for us to acquire, so if you will give me a detailed account of the procedure to follow it will aid greatly in the future."

This letter was received on November 8, 1933, and on the next day I. M. Brandjord, Commissioner of State Lands and Investments, wrote to the United States Engineer Office in reply, stating that the usual way of selling school lands in Montana was through public auction held at the county seat of the county in which the land is located, after previous advertising, but that there was a possibility that a sale might be made to the United States without previous advertising or public auction under the provisions of section 56 of Chapter 60 of the 1927 Session Laws, and stating that he was submitting the matter to the Attorney General for his opinion.

Subsequently, on November 15, 1933, Mr. Brandjord wrote a letter to the United States Engineer Office saying with reference to the Attorney General, "While he has not rendered an opinion on the subject, he intimates that he would deem it far safer both for the State Board of Land Commissioners and for the grantee to have the land sold at a regular sale of state lands in Valley County. We shall see to it that no unnecessary delay is occasioned by the method of procedure.

"According to all records of this office this section of land is located wholly within the boundary lines of Valley County, that is on the west side of the Missouri River, and as a result the sale must be held at Glasgow. * * *

"Please inform us without delay exactly what government subdivisions you require so that we may advertise accordingly. If you need any other state lands in Valley County within the near future, we would prefer to advertise these tracts at the same time."

On the next day, November 16, 1933, the State Board of Land Commissioners, at a duly held meeting, authorized the Commissioner "to advertise and conduct a sale of state lands in Valley County at the earliest possible date embracing all lands that the United States wants to purchase at this time * * * ." At the same meeting the Board adopted a resolution expressly authorizing the United States of America to enter upon said section 16, "at the present time, and to conduct thereon any work, operation or activity relating to the construction by the United States of a dam across the Missouri River at that location."

Notice of this action was given to the United States Engineer Office at Glasgow, which replied by a letter dated November 28, 1933, and received by the State Land Office on November 30, 1933, stating that all communications relating to the purchase of state lands had been turned over to Captain Theodore Wyman, Jr., at Kansas City, Missouri, and that all future dealings pertaining to the acquisition of state land needed for the Fort Peck project would be handled directly through that office.

Meantime, in order to obviate the necessity for the sale of such lands by public auction on prior published notice, Chapter 37 of the Session Laws of the Extraordinary Session of 1933-34, was enacted, and was approved by Governor Cooney on January 11, 1934. It provided for the direct sale to the United States at the price fixed by the latter's Board of Appraisers, of "any land now or hereafter owned by the State of Montana and needed by the United States in the construction of projects for the control of floods, river regulation, conservation of water, irrigation and reclamation works." (Sec. 1.)

The next correspondence concerning the matter was a letter from the United States Engineer Office at Glasgow, Montana, dated February 7, 1934, and received by the State Land Office

on February 9, stating: "The United States desires to purchase for use in the construction of the Fort Peck dam the land belonging to the State of Montana and described as" certain subdivisions of section 16, T. 26 N., R. 41 E., M. M. in Valley county, Montana.

The letter proceeded to state that there had been a loss of 19.1 acres by erosion, and that if a reduction of $315.15 were made therefor from the state's appraisement the value so fixed for the land would be $8,336.65, and that the government offered that amount for the land. The letter closed with this statement:

"Since it is understood that the acceptance of this offer prior to March 1st, 1934, will terminate the existing lease on Section 16, it is requested that acceptance be expedited. Prompt information on the action taken will be appreciated."

The State Board of Land Commissioners, after obtaining necessary legal advice from the Attorney General's office, held a meeting on February 16, 1934, at which the board unanimously decided to accept the said bid, and directed the secretary to prepare the necessary patent and to deliver the same to the United States.

Apparently none of the project lands were purchased prior to the approval of section 25.1 on January 17, 1934, unless the foregoing facts relative to the Taylor, Maxness and state lands constitute such purchase.

The facts relative to the acceptance and assumption of jurisdiction over the lands by the federal government are as follows: The first step toward such assumption was taken on October 10, 1934, when Harry W. Woodring, Acting Secretary of War, wrote to Governor Cooney as follows:

"Honorable Frank H. Cooney,

"Governor of the State of Montana,

"Helena, Montana.

"Dear Governor Cooney:

"I take pleasure in transmitting for your information a map showing in colors the land acquired, and being acquired, for the execution of the project authorized by the Public Works

Administration for the construction of the Fort Peck Dam. These lands include the site of the dam, construction town, tunnels and spillway. The lands, as shown on the map in color, are now either owned by the United States or are in course of acquisition. Those in course of acquisition are in the possession of the United States under the terms of agreement with owners or under order of the Court in condemnation.

"The nature, character and extent of the work at the locality is such that the United States must now assume police jurisdiction over the lands hereinbefore described. It is my duty, therefore, to issue instructions to the federal officials in charge of the work that they shall assume complete and exclusive jurisdiction over these lands. I shall appreciate your cooperation in so advising the officials of your State.

"Sincerely yours,
"(S) HARRY W. WOODRING
"Acting Secretary of War."

This letter was received at the Executive Office at Helena on October 15, 1934, and on the same day Acting Governor Pauline wrote in reply:

"Honorable Harry W. Woodring,
"Acting Secretary of War,
"Washington, D. C.

"Dear Sir:

"This is to acknowledge receipt of your letter of October 10 (E. D. 6500-Fort Peck Res.-362) giving notice that the Federal Government assumes complete and exclusive jurisdiction over lands acquired and being acquired for the construction of the Fort Peck Dam. This is in accordance with the provisions of Chapter 50, Laws of the Extraordinary Session of 1933-34.

"I thank you for the information conveyed, and shall file the map inclosed with the proper State authority, and advise the officials of the State of the action taken by the Federal Government.

"Very truly yours
"[Signed] R. PAULINE,
"Acting Governor."

The Act referred to in the Acting Governor's letter is the statute now appearing as section 25.1 of the 1935 Codes. No map, plat or metes and bounds description of the lands acquired by the government was ever filed in the office of the clerk and recorder of any county in which such lands were situated, as required by section 25.

In the light of these facts we will proceed to interpret and to examine the applicability of sections 24 and 25 on the one hand, and of section 25.1 on the other, to the cession of jurisdiction here in question, bearing in mind that the purposes of the Fort Peck project are flood control and improvement of navigation.

Sections 24 and 25 have been effective in their present form since 1895. They consent to purchases of land made "pursuant to Article I, section 8, paragraph 17, of the Constitution of the United States" and for post office and court house purposes, and cede "exclusive jurisdiction," "reserving, however, to this state a concurrent jurisdiction for the execution upon said lands of all process, civil or criminal, lawfully issued by the courts of the state, and not incompatible with the cession hereby made; provided, that an accurate map or plat and description by metes and bounds of said land shall be filed in the office of the county clerk and recorder of the county in which the same are situated, and if such lands shall be within the corporate limits of any city, such map or plat shall also be filed in the office of the city clerk of said city; and provided, further, that the state reserves the right to tax all property of any railroad or other corporation having a right of way or location over or upon the said land."

Those sections, therefore, (1) relate generally to government purchases of land for the purposes mentioned in the cited provision of the United States Constitution, or for post office and court house purposes, which are within the same provision (*James* v. *Dravo Contracting Co.*, supra.) ; (2) reserve the right to serve civil and criminal process not inconsistent with the cession, and to tax all property of any railroad or other corporation having a right of way or location upon the land, and (3)

require the filing in the office of the county clerk of the county in which the lands are situated, of a map or plat and a metes and bounds description of the lands purchased.

It seems clear to us that the purpose of the Fort Peck project is not within the intent of the said constitutional provision as "for the erection of forts, magazines, arsenals, dockyards, and other needful buildings," nor within the intent of section 24 as "for the purpose of erecting forts, magazines, arsenals, court-houses, postoffices, and other needful buildings." The purpose was the forming of a lake to impound the water of the Missouri River, and apparently an earthwork dam across the river was considered the most practicable means, or the only practicable means, of accomplishing that purpose. Neither the lake nor the dam is a building. It is no answer to say that buildings are needed for warehouses, offices and housing facilities for employees, and that Fort Peck townsite was used for that purpose. Such structures are purely incidental to the purpose of the acquisition of the land. It does violence to the judgment to say that the government purchased the land of this project for the purpose of erecting needful buildings. The purpose was the construction of the dam and lake. This is not to question the government's right to attain those purposes; it is merely to point out the fact that those purposes were not among the ones for which the state of Montana agreed to cede jurisdiction by general sections 24 and 25 in 1895, or at any time prior to the enactment of section 25.1. If it is within those purposes, then under those sections the state must relinquish jurisdiction over land acquired by the federal government for any purpose at all, the attainment of which makes necessary or desirable, purely as an incident, the permanent or temporary construction of buildings. Certainly the legislature had no such intent.

We are aware that it was stated by the district court of the United States for the Western District of Kentucky, in the case of *United States* v. *Tucker*, 122 Fed. 518, 522, that locks and dams were included within the constitutional provision as "other needful buildings" upon the ground that the expres-

sion should be so broadly construed as to make it cover *"all structures and all places* necessary for carrying on the business of the national government."* It seems obviously wrong to construe "buildings" as including "all places," and little less wrong to construe it as including "all structures." While a building or a structure may be a place, the reverse is not necessarily true. A place may be a building or a structure, but also it may be neither, for its commonly accepted meaning is "any particular spot or locality." Therefore it is clearly incorrect to say that the word "buildings" includes "all places." Likewise, while all buildings are structures, not all structures are buildings, for the word "structure," like the word "place," is more inclusive than "building." Whether or not an earthwork dam is a structure or a place, it certainly is not a building.

In any event, the statement in the *Tucker Case* was purely *dictum* for two reasons. The question there was whether the federal criminal jurisdiction was effective "at what is known as Lock Number Three, on Green River, and upon a certain tract of land upon which said lock was then and there and now is located." No dam was involved. Furthermore, it was held that the federal jurisdiction is derived from the state's ceding statute and not from the constitutional provision *per se.* Both Kentucky statutes ceding jurisdiction expressly mentioned dams and locks, so that it was entirely unnecessary to hold even that locks were included within the constitutional expression "other needful buildings." Certainly the case cannot be interpreted as a precedent holding that a dam is a building.

We are aware, also, that in *James* v. *Dravo Contracting Co.,* supra, in a five to four decision it was said, entirely on the authority of the *dictum* in the *Tucker Case*: "Locks and dams for the improvement of navigation, which are as clearly within the federal authority as post offices, have been regarded as 'needful buildings.' (*United States* v. *Tucker,* (D. C.) 122 Fed. 518, 522.) We take that view. We construe the phrase 'other needful buildings' as embracing whatever structures are found to be necessary in the performance of the functions of the federal government." However, in that case also the statement

was purely *dictum,* since there again it was held that limited jurisdiction could be accepted even for the constitutional purposes, and since the West Virginia statute in question expressly ceded jurisdiction of property acquired by the federal government for sites for ''cemeteries, locks, dams,'' etc. It was no more necessary in that case to construe a dam as a building than it would have been to construe a cemetery as such.

In 1918 the supreme court of Kentucky touched upon the point in *Henry Bickel Co.* v. *Wright's Admx.,* 180 Ky. 181, 202 S. W. 672, 674, with reference to a canal: ''If a canal, which is not a fort, a magazine, an arsenal, or dockyard, is to be included, it must be as a 'needful building,' and if a canal is such, then every federally constructed lock and dam or what not is also included, and all railroads may soon pass out of state jurisdiction, a result which would wonderfully curtail state authority and embarrass all courts in the administration of justice with any degree of uniformity.''

We have been unable to find any decision in which it has been adjudicated that an earthfill dam like that at Fort Peck, or any other dam, is a building; and we feel constrained to hold that the Fort Peck dam is not a building.

But it is argued that even though a dam is not a building, it is within the constitutional provision, and therefore within sections 24 and 25, because buildings may be incidentally necessary in connection with the construction or maintenance. If so, a cemetery is within the provision because a tool shed is essential. In fact, it would be hard to find any governmental purpose for the accomplishment or maintenance of which a building might not be considered necessary. If the acquisition of land for all such purposes is within the constitutional provision, then the state has assented in blank to the purchase of, and has agreed to cede jurisdiction over, any land the government may decide to purchase for any conceivable purpose, upon the pretext that buildings are necessary therefor, and that the purchase is accordingly for ''other needful buildings.'' It seems obvious that the land purchased for the Fort Peck project was not purchased for the erection of buildings; that the neces-

sity for buildings at Fort Peck is purely incidental to the real purpose, and that the incidental means cannot be seized upon as the end in order to presume a relinquishment of state sovereignty which was clearly not intended by the legislature in the enactment of sections 24 and 25.

The argument has been made that section 25 should not be strictly construed, particularly so far as the filing of the map or plat and of the metes and bounds description of the land is concerned; that that requirement of section 25 · is not a condition or limitation upon the state's cession of jurisdiction, but is merely a legislative direction for the preservation of a record of the territory to which the cession of jurisdiction had attached. It should be noted, however, that the proviso in question is placed between the two provisos reserving the right to serve process and the right to tax certain property, and there seems no reason why it should be any less regarded than the other limitations.

It is well settled that state statutes relinquishing public power or jurisdiction are to be strictly construed; in fact we have found no authority to the contrary, except the two *Bruce Cases,* supra. In the case of *Henry Bickel Co.* v. *Wright's Admx.,* supra, the supreme court of Kentucky said: ''Every presumption is insistent on the side of the state's sovereignty, compelling a dissolution of every doubt in its favor.''

It was early decided in the land grant, ferry, bridge and tax cases, that public grants, whether of property rights or other attributes of sovereignty, should be strictly construed and that no additional covenants or other limitations upon the public power are to be created by implication. (*Jackson ex dem. Hart* v. *Lamphire,* 3 Pet. 280, 8 Curtis, 419, 421, 7 L. Ed. 679; *Beatty* v. *Knowler,* 4 Pet. 152, 9 Curtis, 36, 7 L. Ed. 813; *Providence Bank* v. *Billings,* 4 Pet. 514, 9 Curtis, 171, 7 L. Ed. 939; *United States* v. *Arredondo,* 6 Pet. 691, 10 Curtis, 315, 8 L. Ed. 547; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 12 Curtis, 496, 9 L. Ed. 773.) In the decision written by Chief Justice Marshall, in *Providence Bank* v. *Billings,* the court said: ''That the taxing power is of vital importance;

that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a state may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear."

In the decision written by Chief Justice Taney, in *Charles River Bridge* v. *Warren Bridge,* supra, the court, after citing the Providence Bank decision with approval, said: "It may, perhaps, be said, that in the case of the Providence Bank, this Court were speaking of the taxing power; which is of vital importance to the very existence of every government. But the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade; and are essential to the comfort, convenience, and prosperity of the people. A state ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in preserving it undiminished. And when a corporation alleges, that a state has surrendered for seventy years, its power of improvement and public accommodation, in a great and important line of travel, along which a vast number of its citizens must daily pass; the community have a right to insist, in the language of this Court above quoted, 'that its abandonment ought not to be presumed, in a case, in which the deliberate purpose of the state to abandon it does not appear.' The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to ac-

complish the ends of its creation; and the functions it was designed to perform, transferred to the hands of privileged corporations. The rule of construction announced by the Court, was not confined to the taxing power; nor is it so limited in the opinion delivered. On the contrary, it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question; and whenever any power of the state is said to be surrendered or diminished, whether it be the taxing power or any other affecting the public interest, the same principle applies, and the rule of construction must be the same. No one will question that the interests of the great body of the people of the state, would, in this instance, be affected by the surrender of this great line of travel to a single corporation, with the right to exact toll, and exclude competition for seventy years. While the rights of private property are sacredly guarded, we must not forget that the community also have rights, and that the happiness and well being of every citizen depends on their faithful preservation.''

The principle so settled is fundamental and has never been reversed, nor even seriously questioned. Recent cases upholding the principle are: *Larson* v. *South Dakota,* 278 U. S. 429, 49 Sup. Ct. 196, 73 L. Ed. 441; *Pothier* v. *Rodman,* (1 Cir.) 291. Fed. 311; *United States* v. *Watkins,* D. C., 22 Fed. (2d) 437; *Six Companies* v. *De Vinney,* (D. C.) 2 Fed. Supp. 693; *State* v. *Mendez,* 57 Nev. 192, 61 Pac. (2d) 300; *Ryan* v. *State,* 188 Wash. 115, 61 Pac. (2d) 1276; *State* v. *Mimms,* 43 N. M. 318, 92 Pac. (2d) 993. In all but the first and the last two of the seven cases cited above the ceding statute in question contained a provision identical with our section 25, in that the requirement of the filing of a map or plat was introduced by the word ''provided,'' without any express statement that the proviso was a prerequisite to the passing of jurisdiction. Yet in all five cases the provision was strictly construed, and the only cases we have been able to find to the contrary are the two *Bruce Cases,* supra.

In *Pothier* v. *Rodman,* the court said: "It is apparent that this section read in the light of the surrounding circumstances, means that the sovereign right of the state of Washington over the land in question and the acquisition of exclusive legislative authority and jurisdiction by the United States thereover was not to take place when the land had been conveyed by deed, but only when, upon such conveyance being concluded, a sufficient description by metes and bounds and an accurate map of each such tract or parcel of land, together with copies of orders, deeds, patents and other evidences of title, had been filed for record in the auditor's office of Pierce county."

In *United States* v. *Watkins* the court said: "We have, then, an Act of cession of the state of California, with conditions attached."

In *Six Companies* v. *De Vinney* the court said: "As the Act in question is general, in order to accomplish a relinquishment of jurisdiction over a particular site, the purpose of the site must be such as is within the purview of the statute; the land constituting the same must have been acquired for such purpose, and thereafter an accurate description and plat of such land so acquired, duly verified, must be filed with the Governor. * * * Statutes relinquishing jurisdiction are strictly construed. A controlling reason for such construction is that it is a matter of the very greatest importance to both the national and the state governments affected. (*Larson* v. *South Dakota,* 278 U. S. 429, 49 Sup. Ct. 196, 73 L. Ed. 441.)"

In *State* v. *Mendez* the supreme court of Nevada said: "They claim, however, that the filing of an accurate description and plat of the lands so acquired, verified by the oath of some officer of the general government having knowledge of the facts, with the Governor of the state, was a mere ministerial act, the omission of which could not have affected the act of cession contemplated by the statute. We do not agree. The proviso, in our opinion, was intended to be complied with to accomplish a completed cession of jurisdiction. Until such compliance the statute was a mere offer upon the part of the state to cede jurisdiction. The proviso provided the manner of accept-

ance. This is also the construction placed upon the statute, by Judge Norcross, in *Six Companies, Inc.*, v. *De Vinney* (D. C.) 2 Fed. Supp. 693, 695. * * *

"The case of *Ft. Leavenworth R. Co.* v. *Lowe*, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264, in which it was held that acceptance by the general government of a state grant of jurisdiction must be presumed, in the absence of any dissent on the part of the former, is not in point. The state statute in that case was a special statute, and evidence of acceptance was not, as in the one before us, made an essential condition of cession.

"As was stated in *Six Companies, Inc.*, v. *De Vinney*, supra, statutes relinquishing jurisdiction should be strictly construed. A controlling reason for such construction is that it is a matter of the greatest importance to both the national and state governments affected. (*Larson* v. *South Dakota*, 278 U. S. 429, 49 Sup. Ct. 196, 73 L. Ed. 441.)"

In *Ryan* v. *State* the question was the interpretation of the ceding Act adopted by the Washington state legislature relative to the Grand Coulee project. In that case the supreme court of Washington well summarized the rule of strict construction of ceding statutes as follows: "But, since self-preservation is the first law of nations and states, as well as of individuals, it will not be presumed, in the absence of clearly expressed intent, that the state has relinquished its sovereignty. (*Wills* v. *State*, 3 Heisk. [141], 50 Tenn. 141; *In re Kelly* (C. C.) 71 Fed. 545; *Ex parte Gaines*, 56 Ark. 227, 19 S. W. 602; *Barrett* v. *Palmer*, 135 N. Y. 336, 31 N. E. 1017, 31 Am. St. Rep. 835, 17 L. R. A. 720.) * * * . The power of taxation is an incident of sovereignty and inherent in the state, because government cannot exist or function without it. It is a legislative power following the more general power to make laws. (*State ex rel. Board of Commissioners* v. *Clausen*, 95 Wash. 214, 163 Pac. 744.) * * * The taxing power of the state is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable. (*Erie R. Co.* v. *Pennsylvania*, 21 Wall. 492, 22 L. Ed. 595; 1 Cooley on Taxation (4th Ed.) 159, par. 60.)"

Actually, this principle should require little, if any, citation of precedents, for the preservation of sovereignty is essentially the preservation of the right to survive. It is the positive duty of the state towards its citizens to survive, and to survive without unnecessary diminution of powers. How, then, can there be any presumption in favor of the cession of jurisdiction? Indeed, the presumption in favor of, rather than against sovereignty, is so strong that it has even been argued in these cases that the federal government should be assumed to have accepted jurisdiction immediately, where evidence of the actual assumption thereof was lacking. Obviously the arguments are inconsistent. If sovereignty is so coveted by governments that its acceptance is to be presumed, it is so valuable that its retention also is to be presumed. The presumption in favor of retention is particularly strong where, as here, the jurisdiction in question is that of the state, whose sovereignty is complete except as clearly abdicated to the federal government by the United States Constitution or by legislative Act of cession.

But in spite of this accepted principle it is contended that liberal construction, even of a statute ceding jurisdiction, is necessitated by section 4, Revised Codes, which provides that the Code provisions are to be ''liberally construed with a view to effect their objects and to promote justice.'' We cannot see how such construction would help accomplishing either of those ends. The object of the first part of the statute is to cede jurisdiction in proper instances; the object of the part in question is to provide how the assumption and therefore the transfer are to be completed. It is not suggested how the proposed interpretation of the latter part will better effect the object of that or any other part of the statute, nor how it will promote justice. Certainly, justice to the people of Montana requires that the transfer of sovereignty be made a matter of immediate public record and notice, particularly under a general statute in which the territory affected is not defined. And certainly it is a novel principle of sovereignty that the terms of an Act of cession should be liberally construed against the

sovereignty, especially where not manifestly necessary "to effect their objects and to promote justice."

We, therefore, hold that the filing of the metes and bounds description and of the map or plat is a condition precedent to transfer jurisdiction under sections 24 and 25, for the dual purpose of effecting the transfer of that jurisdiction to the federal government, and of giving record notice to all in the interest of justice. Any other rule would result in an intolerable confusion, and perhaps in the abdication of state sovereignty without a corresponding assumption of federal jurisdiction. A ceding Act must not be so construed as to make possible a no-man's land within the boundaries of the state.

Section 25.1 became effective on January 17, 1934. It expressed the state's consent to the purchase and condemnation of, and to the cession of "concurrent jurisdiction" over, lands for "the Fort Peck dam, the body of water or artificial lake created by such dam, the land under such body of water, and any lands now owned or which may be hereafter acquired by the United States and which shall touch such body of water, * * * saving, however, to the said state" various rights, including "the right to serve civil or criminal process within the limits of the territory over which jurisdiction is so ceded in any suits or prosecutions for or on account of rights obtained, obligations incurred, or crimes committed in said state, within or without said territory, and saving further to the said state the right to tax persons and corporations, their franchises and property within said territory, * * * provided, however, that jurisdiction shall not vest until the United States, through the proper officers, notifies the governor of the state of Montana that they assume police or military jurisdiction over said territory."

Section 25.1, therefore (1) is a special Act relating solely to the Fort Peck project, (2) reserves the right to serve process thereon even in civil and criminal suits arising within the Fort Peck Reservation, and the right to tax the franchises and property of persons and corporations thereon (together with other important rights not in point here), and (3) expressly

provides that jurisdiction shall not vest until proper notification to the Governor of the assumption thereof by the federal government.

If sections 24 and 25 ever applied to land acquired for this project, they were superseded for all purposes on January 17, 1934, when the special Act, section 25.1, became effective, except as to jurisdiction, if any, which had already vested. Certainly under no possible view of the matter can the federal government have acquired jurisdiction under sections 24 and 25, unless it did so prior to the effective date of section 25.1.

We cannot regard the transactions hereinbefore shown as constituting a purchase of any of this land prior to January 17, 1934. We shall discuss first the state land in section 16. The correspondence in July, 1933, related only to access for the purposes of core drilling and test pit work. It conferred no possible title upon the government. The letter of November 7, 1933, said only that "it will be necessary for the United States to secure title to all of Sec. 16," and inquired concerning the sale procedure. The ensuing correspondence and the action of the State Land Board at its meeting of November 16, 1933, related to the sale procedure and showed an intent to sell the land only at public auction after published notice. Certainly nothing in that or in the permission to occupy the land meantime bound either the federal government to buy or the state to sell; for sales could be made only by intentional acts of the Board in compliance with constitutional and statutory authority. Moreover, a statement that "it will be necessary for the United States to secure title," and an inquiry as to the sale procedure, clearly does not constitute a present offer to purchase. There was nothing which the State Land Board could have accepted to constitute a purchase and sale contract, or an option to purchase. It was not until February 7, 1934, after the legislative enactment on January 11, authorizing direct sale to the United States, and after the legislative enactment on January 17 of section 25.1, that any offer was made to buy the land in section 16; and the offer was accepted on February 16, 1934. Not until then was the federal

government obligated to buy or the state to sell. This constituted the first sale of state land to the United States, and cannot possibly be construed as a sale prior to the effective date of section 25.1.

The transactions concerning the Taylor and Maxness lands were more involved, consisting of options, contracts and other transactions. The provision of the options was, not that possession should constitute notice of acceptance, but that the purchaser should be entitled to possession after notice of acceptance. The most that can be said of the facts is that the owners assented to the premature taking of possession in spite of the fact that the optionee had not yet elected to purchase and was therefore not yet entitled to possession. The possession was entirely outside of the option terms, or under a relaxation thereof by the optionors; it cannot under the circumstances possibly be construed as an election to purchase. The fact that the owners assented to the premature possession negatives such election, for if election had been made no further permission from the optionors would have been necessary. Furthermore, the purchases were not authorized by the proper government officers until December 28, 1933, seventeen days after the options had expired by their own terms; and meantime no acts of possession by subordinates on the ground could legally bind the government to buy the land. Nothing done between December 28, 1933, and January 17, 1934, seems to have altered the situation.

It seems clear that if these unauthorized acts could not bind the government, they could not confer jurisdiction upon it. In the famous case of *United States* v. *Tully*, (C. C.) 140 Fed. 899, 904, the defendant was indicted by a federal grand jury for the crime of murder committed upon land occupied by the military establishment of Fort Missoula. A conviction in the state court had been reversed by this court (*State* v. *Tully*, 31 Mont. 365, 78 Pac. 760, 3 Ann. Cas. 824) on the ground that the crime had been committed within the federal and without the state jurisdiction. However, it developed that the land in question was part of section 36, which had been reserved to the

state for school purposes by the organic territorial Act, and that it had never been lawfully set aside for military purposes but had been occupied by the army without congressional authority. It was held that the federal jurisdiction acknowledged by the state Constitution over military reservations "as now established by law" (Art. II, sec. 1), did not apply to the territory in question. The court said: "If occupancy alone, under such circumstances, constitutes a segregation of land from the public domain, then there was neither necessity for executive order nor congressional action, and it was within the power of the General of the Army or an officer inferior in rank to usurp the powers both of Congress and the executive. * * *

"But we have seen that by granting lands to the territory for school purposes, the right to dispose of them thereafter, if any such right existed at all, was in Congress alone; that neither the President, nor any other executive officer could appropriate or set them aside for any other purpose; and it must follow that if Congress never acted in the matter, and it is admitted that it did not, the reservation of them in the Organic Act, followed by the admission of the state, vested full title in the state.

"Again, we have seen that the executive branch of the government never undertook to usurp the powers of Congress by way of setting aside these lands for military purposes after the Enabling Act was passed; and when Montana was admitted into the Union upon the same footing as the original states, whatever the general government did not reserve by way of its political jurisdiction passed to the state, and the fact that political jurisdiction does so pass, furnishes the reason for the compact which is always entered into when a new state is admitted. The general government is one of delegated powers. As to the original states, those powers were actually delegated. As to those admitted afterwards, the powers conceded by the original states in so far as they relate to political jurisdiction, are reserved, or if not reserved, they are lost. * * *

"It has been argued that the decision made by the supreme court of Montana, being a construction of its own Constitu-

tion, falls within the rule that the federal courts are bound by the decisions of the highest court of a state, in construing its Constitution and laws, and that this court is concluded by that decision. But the Organic Act creating the territory, and the Enabling Act, under which Montana became a state, are federal statutes. Besides, I do not understand the rule to extend to jurisdictional matters. The courts of a state cannot, by their decisions, settle the jurisdiction of the federal courts. Again, a decision of the question involves a construction of the Constitution and laws of the United States, and a grant made by the United States, and it would be an anomaly to say that the decision of a state court could extend, limit, or define the powers of the federal government to the exclusion of the jurisdiction of its own courts. Such a doctrine would amount to a complete surrender of its sovereignty."

Here the only difference is that the lack of authority was executive rather than legislative. Nothing done between December 28, 1933, when authority was given, and January 17, 1934, when section 25.1 became effective, seems to have altered the situation in that respect. So far as we have been able to find, it was not until the firm contracts of purchase and sale were entered into in February, 1934, that the government was obligated to buy or the owners were obligated to sell the land in question, so that the jurisdiction could have been assumed. The execution of those contracts after the effective date of section 25.1, would seem to indicate that the option was regarded as no longer effective, or at least that it had not ripened into a purchase and sale contract, and that the land had not already become the government's by purchase. Whether or not the contract of February 10, 1934, can have obligated the government to purchase even the eighty-acre tract the title to which had been rejected pending a condemnation decree, certainly no informal, unauthorized and involuntary occupation of the land could have constituted an exercising of the option, nor could such informal, unauthorized and involuntary exercising of the option have so obligated it.

The facts clearly negative the argument that the premature taking of possession constituted either a purchase or an election to purchase. Assuming that it constituted the latter, it could at best have given the owners only a right to sue either for specific performance or for breach of contract if the purchase were not voluntarily completed; or they could elect to do neither but merely to cancel the contract. Only one of the owners' three supposed available remedies would have led to consummation of the sales; they would have been under no obligation to pursue that remedy if it in fact existed; and the owners' possession of the right would not empower the optionee, in the light of later developments, to contend that it already had made the purchase. On the other hand, the facts under which the purchases were subsequently completed entirely negative any assumption that they had theretofore already been made, either under the options or otherwise.

It has been held that jurisdiction can pass to the federal government only where title has vested in it. (*In re O'Connor*, 37 Wis. 379, 19 Am. Rep. 765; *United States* v. *Schwalby*, 8 Tex. Civ. App. 679, 29 S. W. 90; *United States* v. *Tully*, supra.) But even if title had vested, it would not automatically follow that jurisdiction had been assumed. Here, on the contrary, it is manifest that the jurisdiction was not assumed nor accepted before October 10, 1934, and that the assumption was not effective until communicated to the Governor's office on October 15, 1934; that the notice of assumption was stated, not as a fact theretofore accomplished, but as a present or prospective act; that it was given as required by section 25.1 and not in the manner required by the provisions of section 25; that it was accepted by the Acting Governor as having been made in accordance with section 25.1; and that the federal government did not dissent from that conclusion.

It can hardly be contended that the jurisdiction over the Fort Peck area lapsed entirely between the occupation or purchase of the land and its actual assumption by the Acting Secretary of War. It had to be somewhere.

Nor can it plausibly be contended that in spite of the obvious legislative intent in all cession statutes that jurisdiction should pass only when expressly assumed in the manner provided, the jurisdiction nevertheless passed when the option was given, or when possession was taken or when the optionor could possibly have enforced the sale, or when the land title actually passed. To do so is to ignore not only the rights of the state, but those of the federal government. Acceptance of jurisdiction does not follow automatically from acceptance of title.

The United States Supreme Court has said with reference to the transfer of jurisdiction, in the case of *Silas Mason Co.* v. *Tax Commission of Washington*, 302 U. S. 186, 58 Sup. Ct. 233, 244, 82 L. Ed. 187: "As such a transfer rests upon a grant by the state, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a state, which may be acquired irrespective of the consent of the state (*Kohl* v. *United States*, 91 U. S. 367, 371, 372, 23 L. Ed. 449 [451]), does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction."

In *Atkinson* v. *State Tax Commission of Oregon,* supra, the court on appeal from the supreme court of Oregon quoted with approval this language of the state court: "The mere fact that there may be on the statute books of the state a general law, such as section 60–1303, Oregon Code 1930, consenting to the purchase of land by the United States and granting to the national government the right to exercise exclusive jurisdiction thereover, does not imply that over all lands purchased by the national government in the state after the enactment of such law the state is divested ipso facto of sovereignty, and exclusive control over the acquired area is assumed by the federal government." In that case the exclusive jurisdiction had been offered

by the state, but not assumed. In the present case it was not even offered prior to the enactment of section 25.1, but if it had been offered under section 25, acceptance could not under the two foregoing decisions be assumed. Finally, if the general rule were otherwise and immediate acceptance could ordinarily be assumed in the absence of proof, that result would not follow here in view of the actual assumption of jurisdiction as of October, 1934, long after the enactment of the special limited jurisdiction Act, section 25.1.

We, therefore, hold that sections 24 and 25 were and are inapplicable to the Fort Peck project; that, if ever applicable, they would have been superseded for the purpose by section 25.1, prior to the passage of any jurisdiction over the lands here involved; that the requirements of section 25 were never complied with; that section 25.1 is the only Act by which Montana has ceded jurisdiction to the United States with reference to the territory involved in the Fort Peck project; that Acts of cession are to be strictly construed, and that jurisdiction does not pass until notice of assumption is given and other conditions have been performed as provided by the statute; that none of the land involved was purchased or otherwise acquired by the United States until after January 17, 1934, the effective date of section 25.1; that the acceptance of jurisdiction by the United States was not expressed until October 10, 1934, and was not effective until October 15, 1934, when the acceptance was communicated to the Governor's office as provided by section 25.1.

The reservations of concurrent jurisdiction made by the legislature with reference to the lands of the Fort Peck project are therefore effective; and the full powers reserved, including the taxing power, continue to reside in the state and in the respective counties in which the lands are situated.

Any other conclusion than that herein reached would obviously result in confusion and hardship, for we would have three varieties of situations with reference to territory included within or covered by the Fort Peck project. The first would be with reference to the lands included within the natural bed

of the Missouri River and its tributaries, the title to which and the jurisdiction over which is in the state of Montana, subject only to the power of Congress to use the lands under the streams "for any structure which the interest of navigation in its judgment, may require." (*James* v. *Dravo Contracting Co.*, supra.) The second would be with reference to lands of the project acquired by the federal government after January 17, 1934, over which, under section 25.1, the state expressly retained entire jurisdiction under its laws pertaining to crimes, taxation, fish and game, service of process, regulations of the livestock sanitary board and the board of health, and in other specified respects. The third would be with reference to lands, if any, acquired prior to the enactment of section 25.1 on January 17, 1934, over which, under sections 24 and 25, the state would retain only very limited rights of taxation and service of process.

If the law were clearly such as to bring about that situation, we would perforce so hold, for we would have no recourse. But the law seeming to us to be otherwise we can see no valid reason to bring about that chaotic and unjust situation under the guise of a liberal interpretation of statutes "with a view to effect their objects and to promote justice." The result would be directly otherwise.

We therefore expressly overrule any and all holdings in *State ex rel. Board of Commissioners of Valley County* v. *Bruce*, 104 Mont. 500, 69 Pac. (2d) 97, and *State ex rel. Board of Commissioners of Valley County* v. *Bruce*, 106 Mont. 322, 77 Pac. (2d) 403, contrary to the views herein expressed.

The last mentioned case went to the United States Supreme Court on writ of certiorari, and on January 9, 1939, was disposed of in *Montana ex rel. Board of County Commrs.* v. *Bruce*, 305 U. S. 577, 59 Sup. Ct.. 465, 83 L. Ed. 363, as follows: "Per Curiam. The judgment of the Supreme Court of Montana is affirmed by an equally divided Court." While that decision is a final determination of the case affirmed, it does not settle the law and is not binding on the United States Supreme Court nor upon this court. The earliest precedent is *Etting* v. *Bank of United States*, 11 Wheat. 59, 77, 6 Curtis, 511, 517, 6 L. Ed.

419, 423, in which Chief Justice Marshall said at the end of the opinion: "In the very elaborate arguments which have been made at the bar, several cases have been cited which have been attentively considered. No attempt will be made to analyze them, or to decide on their application to the case before us, because the judges are divided respecting it. Consequently, the principles of law which have been argued, cannot be settled; but the judgment is affirmed, the court being divided in opinion upon it."

In *Hertz* v. *Woodman*, 218 U. S. 205, 30 Sup. Ct. 621, 622, 54 L. Ed. 1001, one issue was whether the circuit court of appeals for the seventh circuit was precluded from certifying for the decision of the United States Supreme Court a question which the circuit court had theretofore decided in a prior decision which had been affirmed by the Supreme Court by an equally divided court. The Supreme Court said: "The circuit court of appeals was obviously not bound to follow its own prior decision. The rule of *stare decisis*, though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided. The court below, in this instance, when called upon to reconsider its former construction of the inheritance tax Act, found itself confronted by the fact that this court had been equally divided in opinion as to the proper interpretation of the Act, and for that reason alone obliged to affirm the ruling of that and other courts against the legality of the tax which had been collected. If the decision of the court under review had been in favor of the legality of the tax, an affirmance must likewise have resulted from an equal division. That court also found that its own former view of the Act had not been satisfactory to the circuit court of appeals for the eighth circuit, which court had decided contrariwise in *Westhus* v. *Union Trust Co.*, 164 Fed. 795. In such circumstances the court below was not only free to regard the question as one open for determination, but one which might well be certified to this court, that the question of law which had

never been authoritatively decided by this court might be so determined by an instruction as to how it should decide the matter when thus presented for reconsideration. * * * Under the precedents of this court, and, as seems justified by reason as well as by authority, an affirmance by an equally divided court is, as between the parties, a conclusive determination and adjudication of the matter adjudged; but the principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in this or in inferior courts.''

The original judgment in this cause having been based entirely upon the erroneous decisions of this court in the *Bruce Cases,* we hereby reverse the same as to the first cause of action; and the evidence with regard to the second cause of action being insufficient to permit us to determine what amounts should be recovered from McCone county by Valley county, the action must be remanded for retrial of that cause.

It will be recalled that in the second cause of action plaintiff sought the cancellation of the licenses issued by the treasurer of McCone county for automobiles owned or taxable in Valley county, or, if that could not be had, to recover from McCone county ''the sums that would be due it from the owners had the application been made in Valley county.'' It was agreed at the trial that any recovery should be limited to the proceeds of licenses, since Valley county would not have exacted the property taxes upon such cars. It was further alleged that the facts as to the particular automobiles so licensed were peculiarly within the knowledge of defendants but not of plaintiff, and an accounting was therefore sought; but that phase of the action was eliminated by the facts stated in the third paragraph below.

The complaint does not specify the years for which plaintiff seeks recovery, but the answer refers to the year 1938, and the parties seemed to consider that the only year in question. The trial was held in 1938, the evidence related entirely to that year, and judgment was entered on December 29, 1938.

It is unnecessary to decide whether 1938 licenses issued by defendants on cars owned or taxable in Valley county could have been cancelled by the court in the absence of the state and the licensees as parties to the suit, or in view of the other features of the case, for the year 1938 having ended, the matter has become moot.

Appellant shows by its brief that the only recovery sought with reference to licenses issued by defendant in 1938 were the license fees upon the cars mentioned in Exhibits 4 to 24, inclusive. Those exhibits consist of copies of original duplicate license applications, certified by the Registrar of Motor Vehicles. The exhibits were not certified to this court, but all apparently bear the notation "tax exempt by reason of military reservation." It was not shown that "military reservation" referred to lands of the Fort Peck projects, nor that the licenses were issued to owners residing on such lands within Valley county. Further evidence is clearly necessary to show that the cars in question had their situs for licensing and taxation purposes at Fort Peck townsite or elsewhere within Valley county.

License fees for 1939 are in question because the injunction order continued in effect pending this appeal was modified pursuant to stipulation by the parties, to permit respondents "to accept applications for, and to issue licenses upon motor vehicles owned by persons within the townsite of Fort Peck," on condition that all moneys received thereon should be held subject to this court's order upon final determination hereof. Such 1939 license fees should also be adjudicated at the retrial, with or without supplemental pleadings for the purpose, unless the parties can agree which cars so licensed are owned or taxable within Valley county.

Respondents contend that Valley county is not entitled to recover any license money from McCone county because there is no privity between them and no statutory duty. They have cited three decisions of other jurisdictions holding that where a county or other state subdivision has improperly collected a tax or license fee, the remedy of the proper authority is to exact the tax or license fee anew from the owner, leaving

the latter to his remedy, if any, for the illegal exaction. We see no reason for adopting for this jurisdiction a holding so clearly inequitable and burdensome toward the citizen; this is especially true in view of the general constitutional and legislative intent in Montana to do justice as directly as orderly processes permit, without unnecessarily circuitous, multiplicious or otherwise burdensome proceedings. It is especially true, also, because in Montana motor vehicle licenses are not county but state licenses. The question involved in this suit is not whether the licenses issued by McCone county are valid, but whether Valley county was lawfully entitled to have issued them and to have received the net proceeds thereof, to the exclusion of McCone county.

Suits between counties, and money judgments against counties, are provided for by the laws of Montana. Equity having taken jurisdiction of the injunction proceedings, there seems no reason why it should not proceed to give complete relief in the premises, through a money judgment.

One further matter must be discussed for the guidance of the court upon the retrial of the second cause of action. As hereinbefore noted, the answer presented certain questions relative to the situs of automobiles for licensing and taxation purposes. These were presented by the allegations that "in every instance where an application was received or a license issued by McCone county to anyone residing on the townsite of Fort Peck, (1) the vehicle was either on the townsite or within McCone county on January 1, 1938, and was within McCone county at the time of the application for and the issuance of the license, and was in daily or almost daily use on the works of the United States in McCone county, and the owner had his home on the townsite; * * * in instances where the motor vehicles were working on the works of the United States in McCone county the vehicle was in McCone county anyway for approximately eight hours of every day it worked;" (2) "in a number of instances the legal residence of the owner was in McCone county." We will discuss the two classes in reverse order.

The second class is of owners "residing on the townsite," but whose "legal residence" was in McCone county. Appar-

ently by "legal residence" the defendants mean residence for the purpose of registration or voting, under the rules laid down by section 574, Revised Codes, as distinguished from actual residence or domicile. It seems clear that section 574 prescribes merely the conditions determining the right to vote, and has no bearing upon the situs of one's property or the ownership thereof.

The first class is of owners "residing on the townsite of Fort Peck" whose automobiles were "either on the townsite or within McCone county on January 1, 1938," and in McCone county when the license was applied for and issued, and "in daily or almost daily use" in McCone county for approximately eight hours per working day.

The legislature might well have required a motor vehicle license to be obtained in the county where it is most largely to be used. However, probably because of the obvious difficulty of determining the licensing situs under such method, it saw fit to fix that situs in the county "wherein such motor vehicle is owned or taxable." Tangible personal property is usually considered to be owned and taxable where it is habitually kept when at rest, rather than where it is temporarily kept or where it is used during the working hours of the day. Probably the legislature had that idea in mind; otherwise it could readily have prescribed the place of use or major use, as the situs for licensing purposes. In other words, its situs for license and tax purposes would seem to be its habitual situs of rest, · rather than its temporary situs of rest or its situs of employment. In *Coburn Cattle Co.* v. *Small,* 35 Mont. 288, 88 Pac. 953, 955, this court said: "While in some instances the meaning of the lawmakers may be somewhat obscure, we are of opinion that what was intended was this: that all property shall be assessed in the county which is its home." In that case the question was not of rest rather than use, but the court's reference to the property's "home" expresses somewhat the usual idea of the ownership and taxation situs of tangible personal property. While under some circumstances a motor vehicle may be permanently or habitually kept in another county, its ownership,

and therefore its situs for license and tax purposes, is ordinarily in the county of its owner's actual residence or domicile. At least it may be said that if the motor vehicle's owner resides on Fort Peck townsite, it would seem immaterial that his voting residence was in McCone county, or that on January 1, 1938, or when licensed, the motor vehicle happened to be in McCone county, or that it was in that county for some eight hours per day for use upon works or while its owner was working there. Those allegations do not show that the ownership or taxation situs of the automobile is elsewhere than at the owner's residence, but constitute essentially an admission otherwise by way of negative pregnant.

The judgment is reversed and the cause remanded for further proceedings in accordance herewith.

MR. JUSTICE ERICKSON concurs.

MR. JUSTICE ARNOLD:

I did not participate in the hearing of the oral argument, but have examined into the case and concur in the above opinion.

MR. JUSTICE ANGSTMAN:

I concur in the foregoing opinion but on one point I would go further than the reasonable implications inhering in the opinion.

It is my view that in the light of the strange doctrines that lie slumbering in the opinion in the case of *Mountain States Power Co.* v. *Public Service Com.,* 299 U. S. 167, 57 Sup. Ct. 168, 81 L. Ed. 99, the opinion of the United States Supreme Court in the *Bruce Case,* even if unanimous for affirmance, would not be *stare decisis* or binding on this court. The United States Supreme Court had, in the case of *Porter* v. *Investors' Syndicate,* 286 U. S. 461, 52 Sup. Ct. 617, 76 L. Ed. 1226, definitely held that a statute denying a stay or injunction for the enforcement of an order during the time while proceedings were pending to have the validity of the order judicially determined was *clearly* unconstitutional. In the *Mountain States*

*Power Company Case,* supra, it held that its' determination in the *Porter Case* was not an authoritative condemnation of the statute, and that it would not treat such a statute as nonexistent until the state courts had spoken. It reversed the three judge federal court which followed the *Porter Case.* In effect, the *Mountain States Power Company Case* advises bench and bar throughout the nation that what that court said in the *Porter Case* should be treated merely as judicial gossip. I do not concede the correctness of the holding in the *Mountain States Power Company Case.* I think it is shockingly erroneous and merits the sharp criticism made in 50 Harvard Law Review, pp. 813 to 818, and more.

Also, aside from the *Mountain States Power Company Case,* which, I think the Supreme Court of the United States will overrule at the first opportunity, there is another reason why the opinion of the United States Supreme Court, even though it had been unanimous for affirmance of the *Bruce Case,* would not be binding upon this court. It is a fundamental principle of law, supported by a legion of cases, that the United States Supreme Court accepts as binding upon it the construction and applicability of state statutes placed upon them by the courts of the state. In the *Bruce Case* the majority of this court held that section 25, Revised Codes, was the applicable statute. The Supreme Court of the United States in reviewing that case was bound to accept that holding and would not itself inquire into the question as to which statute applied. It was bound to announce its conclusion, taking as established the fact that section 25, and not section 25.1, was the controlling statute. That being the case, there could exist no reason to prevent this court from correcting its own error, and later holding that section 25.1 was and is the controlling statute.

MR. JUSTICE MORRIS:

I dissent. The questions involved in this action, except the automobile license tax matter, were in issue and fully discussed in the case of *State ex rel. Board of Commissioners of Valley County* v. *Bruce,* 104 Mont. 500, 69 Pac. (2d) 97, or in the case

390

under the same title in 106 Mont. 322, 77 Pac. (2d) 403, and as the automobile license tax issue turns entirely on the question whether federal jurisdiction is exclusive or concurrent on the Fort Peck Dam area, a matter upon which this court after an extended review of the facts and the law involved gave its opinion, in which I concurred, I deem further discussion of the controversy as an unjustifiable encumbrance of the reports.