MONTANA ET AL. *v.* CROW TRIBE OF INDIANS ET AL.

No. 96–1829.   Argued February 24, 1998—Decided May 18, 1998

698

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, KENNEDY, THOMAS, and BREYER, JJ., joined. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, *post*, p. 719.

*Clay R. Smith,* Solicitor of Montana, argued the cause for petitioners. With him on the briefs were *Joseph P. Mazurek,* Attorney General, *James E. Torske, Carter G. Phillips, Paul E. Kalb,* and *Christine A. Cooke.*

*Robert S. Pelcyger* argued the cause and filed a brief for respondent Crow Tribe of Indians.

*Jeffrey A. Lamken* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, As-*

*sistant Attorney General Schiffer, Deputy Solicitor General Kneedler*, and *James C. Kilbourne.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case originated in 1978 when the Crow Tribe sought to enjoin the State of Montana and its counties from taxing coal extracted from mines held by the United States in trust for the Tribe. Having succeeded in that endeavor, the Tribe and the United States now seek to recover coal-related taxes once paid to the State and counties by Westmoreland Resources, Inc., a nontribal enterprise that mined coal under a lease from the Tribe. We hold that the restitution sought for the Tribe is not warranted.

I

A

Just north of the northern surface boundary of the Crow Reservation in Montana lies the "ceded strip," approximately 1,137,500 acres of land that was originally part of the reservation. The Tribe ceded the tract to the United States in 1904 for settlement by non-Indians. Act of Apr. 27, 1904, ch. 1624, 33 Stat. 352; see *Ash Sheep Co.* v. *United States,*

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Dennis C. Vacco,* Attorney General of New York, *Barbara G. Billet,* Solicitor General, *John W. McConnell,* Deputy Solicitor General, and *John B. Curcio,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Robert A. Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Thomas J. Miller* of Iowa, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Heidi Heitkamp* of North Dakota, *Mark W. Barnett* of South Dakota, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Richard Cullen* of Virginia, *Christine O. Gregoire* of Washington, and *William U. Hill* of Wyoming; and for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley.*

252 U. S. 159 (1920). Surface interests in the ceded strip were thereafter conveyed to non-Indians, but the United States holds rights to minerals underlying the strip in trust for the Tribe. Since 1904, the State and the Counties of Big Horn, Treasure, and Yellowstone have exercised full legal authority and responsibility for public services on the ceded strip, and the Tribe has not exercised civil jurisdiction over this area. See *Crow Tribe* v. *Montana*, 650 F. 2d 1104, 1107 (CA9 1981) (noting the Court of Appeals' understanding, in *Little Light* v. *Crist*, 649 F. 2d 683, 685 (CA9 1981), that "the ceded area is not a part of the reservation").

In 1972, with the approval of the Department of the Interior and pursuant to the Indian Mineral Leasing Act of 1938 (IMLA), 52 Stat. 347, 25 U. S. C. § 396a *et seq.*, Westmoreland Resources, a non-Indian company, entered into a mining lease with the Tribe for coal underlying approximately 31,000 acres of the ceded strip. After executing the 1972 lease, Westmoreland signed contracts with its customers, four Midwest utility companies, allowing Westmoreland to pass on the cost of valid taxes to the utilities. Westmoreland began mining the coal in the spring of 1974.

In November 1974, Westmoreland and the Tribe renegotiated the 1972 lease. The renegotiated royalties were recognized at the time as being among the highest in the United States. *Crow Tribe* v. *United States*, 657 F. Supp. 573, 587 (Mont. 1985); see App. 376 (testimony of Westmoreland's president that the renegotiated royalty was "by far the highest royalty that was being paid in the nation").[1] A settlement agreement attending the 1974 renegotiation stated that the Tribe found the amended lease and associated documents "satisfactory in that they provide the financial, economic and social protections that the Tribe deems necessary." *Id.*, at

---

[1] Westmoreland's president contrasted the 35 and 40 cents per ton royalties Westmoreland had agreed to pay the Tribe with federal royalties which were "at that time . . . 17 and a half cents a ton, maybe 20 cents a ton." App. 375–376.

44. The amended lease and the royalties for which it provided had an extendable term of ten years, running from June 14, 1972. *Id.*, at 8. Pursuant to the lease, Westmoreland paid the Tribe almost $18 million in royalties through October 1983. *Crow Tribe* v. *United States*, 657 F. Supp., at 588.

In July 1975, the State imposed a severance tax and a gross proceeds tax on all coal produced in Montana, including coal underlying the reservation proper and the ceded strip. See Mont. Code Ann. §§ 15-23-701 to 15-23-704, 15-35-101 to 15-35-111 (1979). The severance tax rate applicable to the ceded strip coal was 30 percent of the contract sales price of the coal extracted;[2] the gross proceeds tax rate was approximately 5 percent of the contract sales price. During the relevant periods,[3] Westmoreland paid approximately $46.8 million in severance taxes to the State and $11.4 million in gross proceeds taxes to Big Horn County.[4] Westmoreland paid these taxes without timely pursuit of the procedures Montana law provides for protests and refunds. App. to Pet. for Cert. 37; see also Tr. of Oral Arg. 13-14. The company subsequently agreed, in exchange for $50,000, to dismiss with prejudice any claim of entitlement to a refund of the severance or gross proceeds taxes it had paid to the State or Big Horn County. App. to Pet. for Cert. 37; see also App. 294-296.

In January 1976, some six months after the State imposed its coal taxes, the Tribal Council adopted an ordinance setting out a Crow Tribal Coal Taxation Code. *Id.*, at 79-86. The Tribe's code imposed a 25 percent severance tax on "all

---

[2] The Montana Legislature, post-1985, incrementally reduced the severance tax rate to 15 percent of the contract sales price. App. to Pet. for Cert. 25.

[3] For the severance tax, the relevant period is 1975-1982, and for the gross proceeds tax, 1975-1987.

[4] Big Horn County collected taxes on its own behalf and for other jurisdictions.

persons engaged in or carrying on the business of coal mining within the boundaries of the Crow Indian Reservatio[n]." *Id.*, at 81; see also *id.*, at 97–98. Reservation boundaries, as described in the code, included the coal beneath the ceded strip. *Id.*, at 81.[5] Under the Tribe's constitution, the tax adopted by the Tribal Council was subject to review by the Department of the Interior. *Id.*, at 329.

In January 1977, the Department approved the Tribe's code "to the extent that it applied to coal underlying the Crow Reservation proper." *Id.*, at 98. Because of a limitation in the Tribe's constitution, however, the Department "disapproved the tax to the extent that it applied to the Crow Tribe's coal in the ceded strip." *Id.*, at 153; see also *id.*, at 217–218, 329.[6] In 1982, the Tribe again enacted a tax for coal mined on the ceded strip, and again the Department rejected the tax. See *Crow Tribe* v. *Montana*, 819 F. 2d 895, 897 (CA9 1987). According to the Superintendent of the Crow Agency, Bureau of Indian Affairs, the Department continued to withhold permission for extension of the Tribe's tax to the ceded area because the Tribe's constitution "disclaimed jurisdiction outside the boundaries of the reservation." App. 218. The Tribe endeavored to amend its constitution to satisfy the Department's objection; it did

---

[5] The Tribe's Chairman, in a March 11, 1975, statement opposing an increase in Montana coal taxes, however, observed that the State "has an important governmental responsibility" for development of Indian coal resources, particularly on the ceded strip; the role of the State, the Chairman added, "is substantially reduced where development takes place on the Crow Reservation, for under . . . federal law the Crow Tribe . . . exercises governmental and proprietary jurisdiction over the people and property within its reservation." App. 53.

[6] On March 3, 1978, the Assistant Secretary of the Interior disapproved, on procedural grounds, an amendment to the Crow Constitution that would have had the effect of applying the Tribe's 1976 coal tax code to the removal of coal underlying the ceded area. *Id.*, at 98; see also Defendant's Exhs. 542, 543.

not petition for court review of the Department's refusal to approve extension of the Tribe's tax to the ceded strip.

B

The Tribe brought a federal action against Montana and Montana counties in 1978, seeking declaratory and injunctive relief against imposition of the State's severance and gross proceed taxes on coal belonging to the Tribe. The State's taxes, the Tribe alleged, were preempted by the IMLA and infringed on the Tribe's right to govern itself. The District Court dismissed the complaint for failure to state a claim upon which relief could be granted. *Crow Tribe* v. *Montana*, 469 F. Supp. 154 (Mont. 1979). The Court of Appeals for the Ninth Circuit reversed. 650 F. 2d 1104 (1981), amended, 665 F. 2d 1390 (1982) *(Crow I)*. It held that the Tribe's allegations, if proved, would establish that the IMLA preempted Montana's taxes, 650 F. 2d, at 1113–1115, and that the taxes impermissibly infringed upon the Tribe's sovereignty, *id.*, at 1115–1117.

While the Ninth Circuit trained on the nonmonetary claim the Tribe was then pursuing, one for declaratory and injunctive relief to stop the imposition of Montana's taxes, the Court of Appeals noted: "As to the taxes already paid by Westmoreland . . . it is true that the Tribe has not paid any of the taxes and is apparently not entitled to any refund if the tax statutes are declared invalid." *Id.*, at 1113, n. 13. The Ninth Circuit further observed that the Tribe's own attempt "to tax its lessees' coal production was partially frustrated by the Secretary of the Interior's refusal to sanction the Tribe's tax ordinances insofar as they applied to coal production on the ceded strip." *Id.*, at 1115, n. 19.

In July 1982, after the *Crow I* decision, the Tribe and Westmoreland entered into an amended lease agreement, approved by the Interior Department that September. Under the amended arrangement, Westmoreland agreed to pay the

Tribe a tax equal to the State's then-existing taxes, less any tax payments Westmoreland was required to make to the State and its subdivisions. See App. 135–141; see also *id.*, at 329–330. The 1982 agreement achieved, prospectively, the federal permission the Tribe had long sought. It allowed the Tribe to have an approved tax in place so that, if successful in the litigation against Montana, the Tribe could claim for itself any tax amounts Westmoreland might be ordered to pay into the District Court's registry *pendente lite.* Correspondingly, the agreement enabled Westmoreland to avoid double taxation, present and future, and it absolved the company from any tax payment obligation to the Tribe for the 1976–1982 period. App. to Pet. for Cert. 32–35.

In November 1982, in keeping with their amended lease agreement, the Tribe and Westmoreland jointly filed a motion to deposit severance tax payments into the District Court's registry, pending resolution of the controversy over Montana's authority to tax coal mined at the ceded strip. *Id.*, at 32. In January 1983, the District Court granted the motion. Thereafter, Westmoreland paid the Montana severance tax into the court's registry in lieu of paying the State. The District Court granted the same interim relief, in November 1987, for the gross proceeds tax. *Id.*, at 35, 36. In ordering the registry deposits, which ultimately would be paid over, with interest, to the prevailing party (Montana or the Tribe), the District Court recalled the Ninth Circuit's observation that "the Tribe is apparently not entitled to any refund of taxes previously paid by Westmoreland to Montana." App. 213 (citing *Crow I,* 650 F. 2d, at 1113, n. 13). The provisional remedy attended to that concern; it "preserve[d the District Court's] power . . . [to give post-1982] tax moneys to their rightful owner after a trial on the merits." App. 215.

In June 1983, the United States intervened on behalf of the Tribe to protect its interests as trustee of the coal upon

which Montana's taxes were levied. Trial took place in January 1984, after which the District Court concluded that federal law did not preempt the State's taxes on coal underlying the ceded strip. *Crow Tribe* v. *United States*, 657 F. Supp. 573 (Mont. 1985). The Ninth Circuit again reversed. *Crow Tribe* v. *Montana*, 819 F. 2d 895 (1987) *(Crow II)*. Montana's taxes, as applied to the ceded strip coal, the Court of Appeals held, were both "preempted by federal law and policies," as reflected in the IMLA, and "void for interfering with tribal self-government." *Id.*, at 903. Explaining its decision, the Ninth Circuit stressed these considerations: The Tribe had a vital interest in the development of its coal resources, *id.*, at 899, 901; the State's taxes had "at least some negative impact on the . . . marketability [of the Tribe's coal]," *id.*, at 900; Montana's coal tax exactions were not "narrowly tailored" to serve only the State's "legitimate" interests, *id.*, at 902. Montana appealed, and this Court summarily affirmed. 484 U. S. 997 (1988).

When the case returned to the District Court in 1988, the Tribe sought an order directing release of the funds held in the court's registry. Montana did not object but, in a new twist, Westmoreland did. The company, for the first time in this protracted litigation, asserted that neither Montana nor the Tribe qualified for receipt of the funds. Montana was out because the Ninth Circuit had declared the State's taxes preempted. The Tribe, according to Westmoreland, did not have a valid tax law in place even in the years following 1982—the fund deposit period—for want of proper Interior Department approval. Therefore, Westmoreland urged, the company should receive back all deposited funds.

Rejecting Westmoreland's novel claim of entitlement to the deposited funds, the District Court observed that the Ninth Circuit, in *Crow I*, 650 F. 2d, at 1117, and *Crow II*, 819 F. 2d, at 898, had characterized the minerals underlying the ceded strip as a " 'component of the Reservation land itself.' "

App. 286.   It follows, the District Court next said, that the tax approved for the reservation proper in 1977, see *supra*, at 703, covered the strip as well, and the Interior Department had erred in ever opining otherwise, App. 286.   As to Westmoreland's operations on the strip, the District Court further stated, the Crow tax had been modified by the 1982 agreement amending the lease.   *Id.*, at 287; see *supra*, at 704–705.   That 1982 Tribe-Westmoreland accord controlled, the District Court concluded, rendering the amount deposited payable to the Tribe, and not to Westmoreland.   Shortly thereafter, the District Court ordered distribution of funds in its registry to the United States, as trustee for the Tribe. App. 288–291.

Having secured exclusively for the Tribe's benefit Westmoreland's post-1982 tax payments once held in the District Court's registry, the United States and the Tribe commenced the fray now before us.   Filing amended complaints against Montana and Big Horn County, they invoked theories of assumpsit and constructive trust in support of prayers to recover some $58.2 million in state and county taxes paid by Westmoreland *prior* to the 1983 and 1987 orders directing deposits into the court's registry.   App. to Pet. for Cert. 243–260.   These complaints alleged that, because the State and Big Horn County had collected taxes from Westmoreland in violation of federal law, it would be unjust and inequitable to allow them to retain the funds.   In "equity and good conscience," the United States and the Tribe urged, Montana should pay over for the benefit of the Tribe all moneys illegally collected, together with interest thereon.   See *id.*, at 249–250, 258–259.[7]   Neither the Tribe nor the United States requested, as additional or alternate relief, recovery for the

---

[7] Specifically, the amended complaints sought all moneys paid as severance taxes from 1975 through 1983, and as gross proceeds taxes from 1975 through 1988, together with prejudgment interest.   App. to Pet. for Cert. 250–251, 259.

Tribe's actual financial losses attributable to the State's taxes.[8]

Montana moved for summary judgment, arguing, *inter alia*, that any refund right that may have existed belonged to Westmoreland, as payer of the taxes in question. *Id.*, at 72. The District Court, in December 1990, denied Montana's motion on the ground that full airing of the parties' positions was in order. *Id.*, at 67–85.

On Montana's application, the District Court certified for interlocutory appeal, pursuant to 28 U. S. C. § 1292(b), the question whether summary judgment for the State was properly denied. *Id.*, at 61–66. The Ninth Circuit, in 1991, initially granted permission for the interlocutory appeal, but one year later, in 1992, dismissed the appeal as improvidently granted. *Crow Tribe* v. *Montana*, 969 F. 2d 848 *(Crow III)*. In dismissing the appeal, the Ninth Circuit commented that the "sole issue" presented was whether the Tribe and the United States, although they did not pay the Montana taxes, were nevertheless positioned to state a claim for relief in assumpsit and constructive trust. That issue, the Ninth

---

[8] An earlier amended complaint filed in November 1982, a year after *Crow I*, sought in addition to the declaratory and injunctive relief originally requested, "restitutionary, tax refunds, money damages, and other relief," including "punitive or exemplary damages." App. 143, 158. The current complaints seek restitution, but do not refer to "refunds" or "money damages."

In 1993, the Tribe sought once again to amend its complaint, *inter alia*, to recover from Westmoreland taxes allegedly due under the Tribe's coal tax ordinance for the period 1976–1982. In a July 1993 order, the District Court denied leave to amend, observing: "This case is now more than fifteen years old"; "defendants have allowed . . . previous motions to amend the complaint to be granted without objection"; "[t]his motion, however, contains additional causes of action . . . [which] could change the nature of the litigation." Record, Doc. No. 637, p. 4. In so ruling, the District Court noted that "[t]he trial court's discretion [to deny tardy amendments] is . . . broadened" when newly alleged facts and theories "have been known to the party seeking amendment since the inception of the cause of action." *Id.*, at 3.

Circuit said, "was already addressed" in *Crow II*. The Court of Appeals then recited passages from *Crow II* indicating why that court had determined that "'the state tax[es] threaten[ed] Congress' overriding objective of encouraging tribal self-government and economic development.'" 969 F. 2d, at 848–849 (quoting *Crow II*, 819 F. 2d, at 903).

C

The District Court conducted a trial in April and May 1994 to determine whether coal taxes paid by Westmoreland to Montana and its counties in the years 1975–1982 unjustly enriched the State and its subdivisions at the expense of the Tribe. In detailed findings and conclusions, that court explained why, in its judgment, the disgorgement remedy sought by the Tribe was not appropriate. App. to Pet. for Cert. 17–38, 42–54.

The Tribe's case rested on three principal points: first, the fact, settled in *Crow I*, that the coal underlying the ceded strip was a mineral resource of the Tribe; second, the federal policy favoring tribal self-government and economic development; finally, the Ninth Circuit's preemption decision. Critical to the preemption decision, the District Court recognized, was the Court of Appeals' determination that "Montana's coal taxes burdened the Tribe's economic interests by increasing the costs of production by coal producers, which reduced royalties received by the Tribe." App. to Pet. for Cert. 45 (citing *Crow II*, 819 F. 2d, at 899).

Counterbalancing the Tribe's case, the District Court observed first that the State and its subdivisions, not the Tribe, provided "[p]ublic services to residents and businesses on the [c]eded [s]trip, many of which facilitate the mining of coal." App. to Pet. for Cert. 47; see *supra*, at 701, 703, n. 5. Key to the District Court's reasoning, however, was the respective taxing authority of State and Tribe.

In a decision rendered two years after the Ninth Circuit's *Crow II* preemption decision, this Court held that both State

and Tribe may impose severance taxes on on-reservation oil and gas production by a non-Indian lessee. *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163 (1989). *Cotton Petroleum* indicated that Montana's taxes on ceded strip coal were invalidated, not because the State lacked power to tax the coal at all, but because the taxes at issue were "extraordinarily high." *Id.*, at 186–187, n. 17.

The Tribe's exercise of taxing authority, on the other hand, required approval from the Secretary of the Interior, and that approval had not been obtained in the relevant period, 1975–1982. See *supra*, at 703–704. In 1988, the District Court had determined that the Interior Department's refusal to approve the Tribe's tax on the ceded strip was an error, see *supra*, at 707, but the presence of the state taxes did not cause that error. App. to Pet. for Cert. 36. Rather, the Department initially questioned the Tribe's authority to tax on the ceded strip and later pointed to the Tribe's noncompliance with the proper procedures for amending its constitution to impose the tax. *Id.*, at 36–37.

Accorded weight in the District Court's evaluation, Westmoreland would not have paid coal taxes to the Tribe prior to 1983, for Interior Department approval was essential to allow pass-through to the company's customers. *Id.*, at 35. Furthermore, under the 1982 lease agreement, see *supra*, at 704–705, the Tribe and Westmoreland stipulated that Westmoreland would have no tax liability to the Tribe for the 1976–1982 period. App. to Pet. for Cert. 36.[9] Moreover, the deposited funds, Westmoreland's post-1982 tax payments,

---

[9] The District Court clarified that its 1988 ruling referring to the Interior Department's error was issued not to suggest any Westmoreland tax obligation to the Tribe in lieu of the State predating the 1982 lease agreement, but "as a basis for ordering that the escrowed funds be released to the Tribe and not Westmoreland by virtue of [that] agreement." App. to Pet. for Cert. 36; see also *id.*, at 53–54.

had been turned over in full to the United States for the benefit of the Tribe. *Ibid.;* see *supra,* at 705–707.

The District Court further noted that Westmoreland did not timely endeavor to recover taxes paid to the State and counties, and that the Tribe did nothing to prompt Westmoreland to initiate appropriate proceedings for refunds. App. to Pet. for Cert. 50–51. In that regard, the District Court recalled the Court of Appeals' statement in *Crow I* that "'as to the taxes already paid by Westmoreland, . . . the Tribe . . . is apparently not entitled to any refund if the tax statutes are declared invalid.'" App. to Pet. for Cert. 53 (quoting *Crow I,* 650 F. 2d, at 1113, n. 13).

Concerning the negative effect of Montana's taxes on the marketability of coal produced in Montana, the District Court entertained additional evidence, supplementing the evidence offered ten years earlier. Westmoreland's president testified that "he could not identify any utility contracts lost during the relevant time period due to Montana's coal taxes," App. to Pet. for Cert. 29, and the parties' economic experts presented conflicting testimony on the impact of Montana's taxes on the sale of Montana coal. The District Court described the conflicting positions, but made no findings on the matter. *Id.,* at 29–30.

Satisfied that the factors justifying preemption did not impel the disgorgement relief demanded by the Tribe, that under *Cotton Petroleum,* the State could impose a reasonably sized severance tax, and that the State, though enriched by Westmoreland's tax payments, did not gain that enrichment unjustly at the expense of the Tribe, the District Court refused to order that Montana coal taxes collected between 1975 and 1982 be remitted to the Tribe.[10]

---

[10] The Tribe and the United States also claimed that the State and Big Horn County were unjustly enriched as a result of their tortious interference with the Tribe's contractual and business relationships with the Shell Oil Company. The District Court rejected this claim as not proved, see

The Ninth Circuit again reversed the District Court's judgment; in a *per curiam* opinion, the Court of Appeals read its prior opinions to require the relief the Tribe demanded, *i. e.*, an order directing the State and county to disgorge approximately $58.2 million in coal taxes paid by Westmoreland to Montana and its subdivisions before Westmoreland began making payments into the District Court's registry. 92 F. 3d 826, amended, 98 F. 3d 1194 (1996) *(Crow IV)*. Acknowledging "the absence of traditional requirements for relief under theories of assumpsit or constructive trust," 92 F. 3d, at 828, the Court of Appeals remanded for entry of the disgorgement order. That court left to the District Court only the "unresolved request[s] for prejudgment interest [and attorney's fees]." *Id.*, at 830–831.

In the Ninth Circuit's view, the District Court had not adhered to the "law of this case," *id.*, at 828,[11] and had therefore abused its discretion, *id.*, at 830. In particular, the Court of Appeals faulted the District Court for giving undue weight to the fact that Westmoreland rather than the Tribe had paid the taxes, *id.*, at 828–829,[12] and to the fact, made plain by this Court in *Cotton Petroleum*, 490 U. S., at 176–187, that "similar [state] taxes are not always preempted," *Crow IV*, 92 F. 3d, at 829. Further, the Ninth Circuit discounted the public services Montana provided at the ceded strip because "the State would have provided such services even if the

---

*id.*, at 54–57, and the Ninth Circuit affirmed that disposition. 92 F. 3d 826, 830–831, amended, 98 F. 3d 1194 (1996). We denied the Tribe's crosspetition for review of the final judgment disposing of the Shell Oil claim. 522 U. S. 819 (1997).

[11] The Court of Appeals repeatedly referred to "law of the case" made in *Crow III*, see 92 F. 3d, at 828, and n. 2, 829, a decision denying interlocutory review and therefore containing no "holding," see *supra*, at 708–709.

[12] But cf. *Crow I*, 650 F. 2d, at 1110 ("incidence of [Montana's] taxes is on the non-Indian mineral lessee"); *id.*, at 1113, n. 13 ("[a]s to the taxes already paid by Westmoreland, . . . [the Tribe] is apparently not entitled to any refund").

Tribal coal had not been mined." *Ibid.* Finally, the Court of Appeals attributed to the District Court a finding that Westmoreland "would have paid the tribal tax even without [the Interior Department's] approval because [Westmoreland] agreed to do so in its 1982 lease." *Id.*, at 830; see also *ibid.* ("Westmoreland was willing to pay coal taxes to the Tribe as early as 1976, so there was no reason for the [District Court] to distinguish between the taxes collected before and after 1982.").[18]

We granted certiorari, 522 U. S. 912 (1997), and now reverse the judgment of the Court of Appeals.

## II

### A

The petition for certiorari presents the question whether the Tribe—or the United States as its trustee—may recover state and county taxes imposed on and paid by the Tribe's mineral lessee, Westmoreland, a party who has forfeited entitlement to a tax refund. Taxpayer Westmoreland, it is undisputed, did not qualify for a refund because the company failed to pursue protest and claim procedures within the time Montana law prescribes. Further, Westmoreland entered into a settlement with the State and the county relinquishing any claim it might have had for return of the tax payments in question. See *supra,* at 702.

As a rule, a nontaxpayer may not sue for a refund of taxes paid by another. See, *e. g., Furman Univ.* v. *Livingston,* 136 S. E. 2d 254, 256, 244 S. C. 200, 204 (1964); *Krauss Co.* v. *Develle,* 236 La. 1072, 1077, 110 So. 2d 104, 106 (1959); *Kesbec, Inc.* v. *McGoldrick,* 278 N. Y. 293, 297, 16 N. E. 2d 288, 290 (1938); cf. *United States* v. *California,* 507 U. S. 746, 752 (1993). The Ninth Circuit evidently had that rule in mind

---

[18] But cf. App. to Pet. for Cert. 35 (District Court found that during the 1975 through 1982 period Westmoreland "would not have paid coal taxes to the Tribe as no Department of Interior approval had been obtained to allow a pass-through to its customers").

when it noted, in *Crow I*, that the Tribe "is apparently not entitled to any refund" of taxes Westmoreland had paid to Montana. 650 F. 2d, at 1113, n. 13.

The Tribe now maintains, however, that the disgorgement remedy approved by the Ninth Circuit does not fall within the "refund" category. The Tribe suggests two ways of analyzing its claim. First, Westmoreland was liable for tax payments, but it paid the wrong sovereign; the Tribe, not the State, should have been the recipient of those payments. Second, the State's taxes adversely affected the Tribe's economy by reducing the demand for the Tribe's coal and the royalties the Tribe could charge; a remedial order transferring Westmoreland's 1975–1982 tax payments from Montana to the Tribe would eliminate the enrichment unjustly gained by the State at the Tribe's expense.

Before inspecting the Tribe's justifications for the disgorgement ordered by the Court of Appeals, we place in clear view a pathmarking decision this Court rendered less than two years after our summary affirmance in *Crow II*.[14] In *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163 (1989), we held that the IMLA did not preempt New Mexico's nondiscriminatory severance taxes on the production of oil and gas on the Jicarilla Apache Reservation by Cotton Petroleum, a non-Indian lessee. *Id.*, at 186–187. In so holding, we acknowledged that the same on-reservation production of oil and gas was subject to tribal severance taxes, *id.*, at 167–169, and that New Mexico's taxes might reduce demand for on-reservation leases, *id.*, at 186–187. *Cotton Petroleum* clarified that neither the IMLA, nor any other federal law, categorically preempts state mineral severance taxes imposed, without discrimination, on *all* extraction enterprises in the State, including on-reservation operations. "Unless and until Congress provides otherwise, each of the

---

[14] "A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." *Anderson* v. *Celebrezze*, 460 U. S. 780, 785, n. 5 (1983).

. . . two sovereigns[—State and Tribe—]has taxing jurisdiction over all [on-reservation production]." *Id.*, at 189.

The Court in *Cotton Petroleum* distinguished *Crow II* in a footnote referring to the Solicitor General's representation that Montana's taxes were "extraordinarily high" and the Ninth Circuit's recognition that "the state taxes had a negative effect on the marketability of coal produced in Montana." 490 U. S., at 186–187, n. 17. Montana, *Cotton Petroleum* thus indicates, had the power to tax Crow coal, but not at an exorbitant rate. See *id.*, at 187, n. 17 (according to the Tribe's expert, Montana's rate was " 'more than twice that of any other state's coal taxes' ").[15] We examine the Tribe's disgorgement claim in light of *Cotton Petroleum*, a decision on the books before the Tribe (and the United States) filed their current claims for restitution.

## B

We consider first the argument that the Tribe, not Montana, should have received Westmoreland's 1975–1982 coal tax payments; therefore the proper remedy is to require the State to turn all taxes it collected from Westmoreland over to the Tribe. As authority, the Tribe and the United States rely on cases typified by *Valley County* v. *Thomas*, 109 Mont. 345, 97 P. 2d 345 (1939). That case involved a Montana law providing for the licensing of motor vehicles by the county in which the vehicle is owned and taxable. Valley County claimed that McCone County was unlawfully issuing licenses, and collecting license fees, for vehicles owned and taxable within Valley County. Valley sued McCone for both injunctive and monetary relief. The Montana Supreme Court held that if Montana's vehicle licensing law made Valley, not McCone, the county entitled to issue the licenses in question,

---

[15] Since 1985, the District Court observed, "the Montana legislature has enacted production incentive credits and incrementally reduced the amount of the severance tax"; in November 1994, the rate was 15 percent of the contract sales price. App. to Pet. for Cert. 25.

then Valley could recover from McCone the fees McCone improperly collected. It would make scant sense, the court reasoned, to hold instead that Valley should "exact the . . . license fee anew from the [vehicle] owner, leaving the latter to his remedy, if any, for the illegal exaction." *Id.*, at 385–386, 97 P. 2d, at 366.

As the District Court in this case correctly recognized, App. to Pet. for Cert. 49–50, the *Valley County* pattern is not the one presented here. There, the Montana licensing statute bound both counties. One, and not the other, was the sole subdivision authorized to issue the license and collect the fee. Here, as *Cotton Petroleum* makes plain, neither the State nor the Tribe enjoys authority to tax to the total exclusion of the other. Moreover, dispositively distancing the Tribe's situation from that of the prevailing subdivision in *Valley County*, the Tribe itself could not have taxed lessee Westmoreland during the period in question, for the Interior Department (whether wrongly or rightly) had withheld the essential permission.

It bears repetition that the Department did not approve the Tribe's imposition of a coal tax on ceded strip production until September 1982, see *supra*, at 705, that the Tribe never sought judicial review of the Department's pre-1982 disapprovals, see *supra*, at 703–704, that Westmoreland would pay no tax to the Tribe absent Department approval, see *supra*, at 706, 710, 713, n. 13, that Montana's taxes did not impede the Tribe from gaining the Department's clearance, see *supra*, at 710, and that Montana received no share of the post-1982 tax payments released from the District Court's registry, see *supra*, at 705–707. These were factors the District Court correctly considered significant in holding disgorgement an exorbitant, and therefore inequitable, remedy.[16]

---

[16] In view of the evidence diligently canvassed by the District Court, including the Tribe-Westmoreland 1982 agreement that Westmoreland would have no tax liability to the Tribe for the 1976–1982 period, see

## C

The negative impact of Montana's high taxes on the marketability of the Tribe's coal, as the District Court correctly comprehended, was the principal basis for the Ninth Circuit's *Crow II* preemption decision. See *supra,* at 709. The Tribe and the United States urge that impact as an alternative justification for requiring Montana to disgorge taxes collected from Westmoreland from 1975 through 1982.

At oral argument, counsel for the Tribe clarified that the impact of concern was not coal that went unsold because the State's tax made the price too high. See Tr. of Oral Arg. 37. Instead, the Tribe's disgorgement claim rested on the coal "actually produced and sold"; by taxing that coal, counsel maintained, Montana "deprived [the Tribe] of its fair share of the economic rent." *Ibid.*

Again, however, the Tribe itself could not have exacted a tax from Westmoreland before 1983, because the Interior Department withheld approval. And the royalty the Tribe and Westmoreland agreed upon in 1974 was both high and long term, running until June 1982. See *supra,* at 701–702. No evidence suggests Westmoreland would have paid higher royalties, but for Montana's tax. It merits emphasis also, as the District Court recognized, App. to Pet. for Cert. 46, 50, that under our *Cotton Petroleum* decision, Montana could have imposed *a* severance tax, albeit not one so extraordinarily high. See *Cotton Petroleum,* 490 U. S., at 186–187 (New Mexico's oil and gas severance taxes imposed on on-reservation production, amounting to about 8 percent of the value of the taxpayer's production, were not preempted by federal law although the taxes could be expected to have "at least a marginal effect on the demand for on-reservation

*supra,* at 705, 710–711, we see no substantial basis for believing that Westmoreland "would have paid the tribal tax even without [the Interior Department's] approval" or that "Westmoreland was willing to pay coal taxes to the Tribe as early as 1976," six years before the Department agreed that the Tribe was positioned to tax coal mined at the ceded strip. *Crow IV,* 92 F. 3d, at 830.

leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate").

The District Court did not consider awarding the Tribe, in lieu of all the 1975–1982 taxes Montana collected, damages based on actual losses the Tribe suffered. We cannot call this an oversight. The complaint contained no prayer for compensatory damages. See *supra*, at 707–708, and nn. 7, 8. Nor did the proof establish entitlement to such relief. See *supra*, at 711.[17]

The only testimony homing in on Westmoreland's sales came from the company's president. He could "identify [no] utility contracts lost during the relevant time period due to Montana's coal taxes." App. to Pet. for Cert. 29. While he acknowledged that some customers "exercise[d] the payment option under their contracts rather than continuing to receive coal and that the Montana coal taxes were probably a factor," he identified as other factors "demand, alternative sources, and transportation." *Ibid.* Indeed, as just noted, see *supra* this page, the Tribe concentrated on disgorgement as the desired remedy; it deliberately sought "no damages . . . now" for "coal that was not sold because the price was too high [due to] the State's tax." Tr. of Oral Arg. 37. Federal Rule of Civil Procedure 54(c), therefore, could not aid the Tribe. That Rule instructs that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." The Tribe, however, had not shown entitlement to actual damages.

In sum, the District Court carefully and fairly determined that the disgorgement demanded was not warranted and should not be granted. In so ruling, that court endeavored to heed both *Crow II* and *Cotton Petroleum*, and closely attended to the history of and record in this tangled, long-

---

[17] The Tribe attempted, unsuccessfully, to show that Montana's high taxes caused the Tribe to lose its lease with Shell Oil Company. See *supra*, at 711–712, n. 10.

pending case. See *supra*, at 708, n. 8. Proceeding as it did, the District Court ignored no tenable "law of the case" and did not indulge in an "abuse of discretion." See *Crow IV*, 92 F. 3d, at 829, 830.

As a result of the District Court's orders for registry deposits, see *supra*, at 705, the Tribe has displaced Montana to this extent: With respect to ceded strip mining operations, all severance taxes have gone to the Tribe since January 1983, and all gross proceeds taxes since November 1987. Montana's retention of preregistry deposit taxes must be assessed in light of the court-ordered distribution of all funds in the registry to the United States, as trustee for the Tribe. See *supra*, at 707. The District Court, best positioned to make that assessment, was obliged to do so based on the case and proof the parties presented. The Tribe and the United States here argued for total disgorgement. They did not develop a case for relief of a different kind or size. While we do not foreclose the District Court from any course the Federal Rules and that court's thorough grasp on this litigation lead it to take, we are satisfied that the Court of Appeals improperly overturned the District Court's judgment.

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

The Court's meticulous treatment of this exhausting litigation, including its discussion of the way *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 186, n. 17 (1989), bears on *Crow Tribe* v. *Montana*, 819 F. 2d 895 (CA9 1987) *(Crow II)*, summarily aff'd, 484 U. S. 997 (1988), shows the error of

requiring disgorgement to the Crow Tribe of all Montana taxes collected from Westmoreland based on coal mined from the ceded strip between 1976 and 1982. As the Court explains, *ante,* at 715, *Cotton Petroleum* makes clear that the taxes were objectionable not because the State was wholly disentitled to tax the Tribe's coal operation, but because the "'extraordinarily high'" taxes affecting the marketability of the Tribe's coal were simply excessive. 490 U. S., at 186–187, n. 17. Since Montana was free to levy and collect the portion of taxes below the threshold of excessiveness, I concur in the Court's decision to reverse the judgment and remand for further proceedings.

If the Court stopped there, the Court of Appeals would be free to set the stage for the District Court to engage in serious weighing of a claim to partial disgorgement under the Tribe's complaint, which, as now amended, seeks disgorgement of all moneys "illegally collected."* Although this request for relief was originally predicated on a reading of *Crow II* that *Cotton Petroleum* shows was too expansive, the Tribe's prayer naturally encompasses the lesser claim to disgorgement of any taxes in excess of the State's limit.

It would be open to the Court of Appeals, further, to indicate that nothing done either by the Department of the Interior or by the Tribe raised a dispositive bar to the Tribe's claim to pre-1983 revenues, contrary to what the District Court had suggested, App. to Pet. for Cert. 35–37, leaving that latter court free to determine what had been excessive and to reweigh the equities. After considering what the Tribe had already received, among the other relevant facts, the District Court might require disgorgement of all, some, or none of the excessive taxes for the period before 1983.

The Court impedes any such exercise of trial court discretion, however, if it does not entirely foreclose it. Although the Court says that it does not "foreclose the District Court

---

*In December 1990, the United States, as trustee for the Tribe, filed its own amended complaint seeking essentially the same relief.

from any course the Federal Rules and that court's thorough grasp on this litigation lead it to take" when the case is returned to it, *ante,* at 719, the Court's conclusions effectively thwart application of one of the principal rules of restitution that should be brought to bear on this case. It is from the resulting truncation of the District Court's discretion that I respectfully dissent.

Although both Montana and the Tribe may tax the value of the coal on its extraction or severance from the land, *ante,* at 714–715, Montana may tax only to a certain economic point. Beyond that point, as between Montana and the Tribe, only the Tribe may add to the tax burden. When a taxing authority like Montana has taxed unlawfully to the prejudice of another jurisdiction that should have received the revenue in payment of its own lawful tax, accepted principles of restitution entitle the latter government to claim disgorgement of what the former had no business receiving. At the most general level, a "person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1, p. 12 (1937). At a more specific level, there is the rule that "[w]here a person has paid money . . . to another in the erroneous belief, induced by mistake of fact, that he owed a duty to the other so to do, whereas such duty was owed to a third. person, the transferee . . . is under a duty of restitution to the third person." *Id.,* § 126(1), at 514. The Supreme Court of Montana has accordingly held, as the majority recognizes, *ante,* at 715–716, that as between two jurisdictions claiming to tax the same transaction, one that collected taxes without lawful authority must surrender them to the other one, entitled to impose them, *Valley County* v. *Thomas,* 109 Mont. 345, 97 P. 2d 345 (1939); see also, *e. g., College Park* v. *Eastern Airlines, Inc.,* 250 Ga. 741, 742–744, 300 S. E. 2d 513, 515–516 (1983) (invoking "general equitable principles of restitution," including § 126(1), to hold that one municipality may recover taxes mistakenly paid to another); *Indian Hill* v. *Atkins,* 153

Ohio St. 562, 566–567, 93 N. E. 2d 22, 25 (1950) (citing § 126(1) and authorizing suit by one town to recover taxes paid to another); *School Dist. No. 6* v. *School Dist. No. 5,* 255 Mich. 428, 429, 238 N. W. 214, 215 (1931) (authorizing suit to recover taxes paid to wrong school district because "[t]hrough breach of the law, plaintiff and its taxpayers have been deprived of their just due, and defendant has money which in equity and good conscience belongs to plaintiff"); *Balkan* v. *Buhl,* 158 Minn. 271, 279, 197 N. W. 266, 269 (1924) ("[T]o permit defendant to retain any of the taxes wrongfully collected by it from its neighbor's territory, would be to permit it to benefit from its own wrong . . . . Such a result is so objectional as to require no discussion beyond its bare statement"). Under Montana's own law, then, reflecting accepted principles of restitution, the Tribe raises at least a facially valid claim when it seeks disgorgement of the excess taxes collected by the State in the period before 1983.

Although the Court seeks to differentiate this case from the ambit of *Valley County,* the proffered distinctions come up short. First, it is not to the point that in *Valley County* only one jurisdiction could validly tax, whereas here both may do so, *ante,* at 716. The remaining element of the Tribe's claim against Montana goes only to the state revenues that might be found to have exceeded the limit of valid state taxation; beyond the point at which state taxation became excessive the State had no authority, while the Tribe did. (It is true, of course, that in this case the respective spheres of the two taxing jurisdictions are bounded by an economic, not a geographic, line. But that distinction does not affect the principle involved, and the Court does not argue otherwise.)

Second, *Valley County* is not distinguishable on the ground that the governmental claimant there had an enforceable licensing and revenue scheme in place, whereas the Tribe "could not have taxed lessee Westmoreland during the period in question, for the Interior Department (whether

wrongly or rightly) had withheld the essential permission," *ante*, at 716. The District Court's original ruling, acknowledged in its most recent opinion and never challenged by Montana, was that the Tribe "at all relevant times . . . had a valid coal mining tax applicable to Westmoreland's mining on the Ceded Strip." App. to Pet. for Cert. 36. After the Ninth Circuit's ruling in *Crow II* that the mineral estate beneath the surface of the ceded strip was a part of the Tribe's reservation, 819 F. 2d, at 898, the District Court observed:

> "This analysis of the Reservation status of the Crow coal compels the conclusion that the approval which the Department of the Interior gave to the 1976 tax ordinance was fully applicable to Westmoreland's mining of Crow Ceded Strip coal because that coal was and is a component of the Reservation land itself. The approval of the Department of Interior of the 1976 Crow Tribal Tax Code as it applied to activities on the Reservation was necessarily an approval of that tax as being applicable to Westmoreland's mining of Crow Tribal coal. Accordingly, the Interior Department's purported refusal to approve the tax as it might apply to any mining operation on the Ceded Strip was based on what the Ninth Circuit has found to be a mistaken interpretation of the applicable law." App. 286.

Thus, the Tribe's provision must now be recognized as valid for the period in question, and there is no apparent reason why the Tribe should be disqualified from seeking to obtain the State's excess revenues that should have gone to the Tribe under the Tribe's own tax regulation. While the Tribe could not have enforced the tax against Westmoreland without the Interior Department's approval, that is neither here nor there as between the Tribe and the State. And although the Tribe failed to obtain judicial review of the Department's refusal, that has no bearing on the equity of the State's retention of money to which it never had a valid

claim. That is, there is no apparent reason to hold that the originally unlitigated third-party mistake of the Interior Department should affect the restitution claim as between two rival taxing authorities, one of which was clearly entitled to tax but got nothing, the other of which was entitled to nothing by way of excess taxes, but has pocketed the money anyway.

Third, despite a suggestion in the Court's opinion, *ante*, at 710, 716, *Valley County* is not rendered inapposite by the Tribe's 1982 agreement with Westmoreland. So far as it matters here, that agreement simply capped Westmoreland's tax burden at the limit imposed by Montana's then-current taxing scheme and did not purport to govern any claim the Tribe might have against the State.

To reject the Court's attempts to distinguish this case from *Valley County* is not, of course, to deny that any distinction exists. In fact, there is a significant difference between the two situations, and one that may prevent the door from closing entirely against the pre-1983 claim. In *Valley County* and the comparable cases, the disgorgement issue turned on the relative merits of the competing jurisdictions' claims of entitlement to impose a tax; neither rival government had any interest in the property or activity taxed except that of a taxing authority. In this case, however, that is not so, for the Tribe that sought to tax the extraction of the coal was also the owner of the coal before the extraction. Thus, any tribal taxation was merely a way to recover or retain some of the value of the Tribe's own property (a fact unaffected by the favorable terms of the Tribe's royalty agreement with Westmoreland, see *ante*, at 717); so, too, Montana's receipt of the excess taxation (passed on by Westmoreland) was an appropriation of the Tribe's own property, just as it was an invalid counterpart of the tax collection that would have been rightful by the Tribe. The Ninth Circuit recognized this when it found that "Montana made plain its intention to appropriate most of the economic rent" of the

Tribe's coal. See *Crow Tribe* v. *Montana*, 650 F. 2d 1104, 1113 (1981). Because the Tribe's claim may properly be viewed in this light, we can put to one side any questions whether the Court is right, or I am, about the significance of the error by the Department of the Interior or the point-for-point applicability of *Valley County*. We may bypass the principles specific to claims between contending taxing authorities entirely and simply ask whether something in this record would in practical terms defeat the Tribe's claim to disgorgement of its own property taken in the form of excess taxes. The Court's answer to this question is uncertain. The Court endorses the view that some degree of disgorgement would have been "exorbitant," *ante*, at 716, and "compensatory damages" unjustified, *ante*, at 718, and it suggests that the District Court's previous award to the Tribe of all taxes paid into the registry after 1982 amounted to a windfall big enough to provide at least rough restitution for the excessive share of taxes collected in the preceding six years. *Ante*, at 716, 719. At the same time, the Court says it imposes no bar to the possibility of further remedial action in the trial court. Perhaps the Court sees the windfall only when it regards the Tribe as one of two rival taxing authorities, as distinct from the Tribe as a property owner that has suffered as such. I trust that this distinction is open for exploration and development upon remand. Whether the Tribe is equitably entitled to a penny more than it has now, I do not know, but I think it is clear that nothing in this record disentitles the Tribe at least to press for disgorgement of some or all of Montana's pre-1983 excess tax revenues.